## Case No. 17,214.

### WASHBURN et al. v. GOULD.

[3 Story, 122; 2 Robb. Pat. Cas. 206; 1 West. Law J. 465; 7 Law Rep. 276.] [1]

Circuit Court, D. Massachusetts. May Term, 1844.

PATENT FOR INVENTION — INTERPRETATION — ISSUE OF LETTERS—WHO ENTITLED—RIGHT TO USE— INFRINGEMENT SUIT BY GRANTEE—INJUNCTION— DAMAGES.

1. The extension of a patent may be granted to an administrator.

2. Whoever finally perfects a machine, and renders it capable of useful operation, is entitled to a patent, although others may have had the idea, and made experiments towards putting it into practice, and although all of the com-

---

[1] [Reported by William W. Story, Esq. 1 West. Law J. 465, and 7 Law Rep. 276, contain only partial reports.]

ponent parts may have been known under a different combination, or used for a different purpose.

[Cited in Allen v. Blunt, Case No. 217; Dietz v. Wade. Id. 3,903; White v. Allen, Id. 17,535: Smith v. Mercer. Id. 13,078; Agawam Woolen Co. v. Jordan, 7 Wall. (74 U. S.) 602; Seymour v. Osborne, 11 Wall. (78 U. S.) 552; Albright v. Celluloid Harness Trim. Co., Case No. 147; Union Paper-Bag Mach. Co. v. Pultz & Walkley Co., Id. 14,392; Judson v. Bradford, Id. 7,564; Smith v. Downing. Id. 13,036; American Bell Tel. Co. v. American Cush. Tel. Co., 35 Fed. 739.]

3. Drawings, not referred to in the specification of a patent, may be treated as part of the specification, and used to explain and enlarge it.

[Cited in Emerson v. Hogg. Case No. 4,440.]

4. A new trial will not be granted for surprise on account of new evidence, whenever, by reasonable diligence, it could have been previously obtained.

5. The meaning of technical words of art in commerce and manufactures, used in a patent, as well as the surrounding circumstances, which may materially affect their meaning, are to be interpreted by the jury.

[Cited in brief in Wilstach v. Hawkins, 14 Ind. 550.]

6. Every instrument is to be interpreted by a consideration of all its provisions, and its obvious design is not to be controlled by the precise force of single words.

[Cited in brief in Lowell v. Allen, 96 Mass. 134. Cited in Omohundro v. Omohundro, 21 Grat. 633.]

7. Where a grant was made of a right to construct and use fifty machines within certain localities, reserving to the grantor the right to construct, and to license others to construct, but not to use them therein, it was held, that the grant was of an exclusive right under the statute of 1836 in regard to patents. and that suits were to be brought in the name of the assignees, even though agreed to be at the expense of the grantor.

[Cited in Wilson v. Rousseau, Case No. 17,-832; Woodworth v. Rogers, Id. 18.018; Birdsall v. Perego, Id. 1,435. Cited in dissenting opinion in Adams v. Burks, 17 Wall. (84 U. S.) 458. Cited in Nellis v. Pennock Manuf'g Co., 13 Fed. 453; Herman v. Herman. 29 Fed. 93.]

8. Where a patent has been granted, and there has been an exclusive possession of some duration under a patent, an injunction will be granted, without obliging the patentee previously to establish the validity of his patent by an action at law. But it is otherwise, if the patent be recent, and the injunction be resisted on the ground, that the patent ought not to have been granted, or is imperfectly stated in the specification.

[Cited in Smith v. Mercer. Case No. 13,078; Foster v. Moore. Id. 4,978; Howe v. Williams, Id. 6,778.]

9. The patent in the present case was, upon the true interpretation of the specification, a patent for an improved machine.

[10. The patentee is prima facie the inventor of that for which the letters patent were granted him.]

[Cited in Hill v. Dunklee, Case No. 6,489; American Bell Tel. Co. v. People's Tel. Co., 22 Fed. 313; Cantrell v. Wallick, 117 U. S. 696, 6 Sup. Ct. 974.]

[11. The rule of comity always observed by the justices of the supreme court in cases which admitted of being carried before the whole court was to conform to the opinions of each other, if any had been given.]

[Cited in Many v. Sizer, Case No. 9,057: Goodyear Dent. Vul. Co. v. Willis. Id. 5,-603; Rumford Chem. Works v. Hecker, Id. 12,133; Wells v. Oregon Ry. & Nav. Co., 15 Fed. 570.]

[12. The actual damages sustained include all necessary and proper expenses in protecting one's violated rights. Though they should not include "smart money," or what is proper merely for example. they may well embrace everything really suffered by the wrong.]

[Cited in Aiken v. Bemis, Case No. 109; Allen v. Blunt, Id. 217.]

This was an action on the case [by William Washburn and others against James Gould] for the infringement of a patent right for "a new and useful improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings, or facing metallic, mineral or other substances," and described in the schedule annexed to the letters patent, and forming a part thereof, in the following words:

"The plank, boards or other material, being reduced to a width by circular saws, or friction wheels, as the case may be, is then placed on a carriage resting on a platform, with a rotary cutting wheel in the centre, either horizontal or vertical. The heads, or circular plates, fixed to an axis, may have one of the heads movable to accommodate any length of knife required. The knives fitted to the heads with screws or bolts, or the knives or cutters for moulding, fitted by screws or bolts to logs connecting the heads of the cylinder, and forming with, the edges of the knives or cutters a cylinder. The knives may be placed in a line with the axis of the cylinder or diagonally. The plank, or other material resting on the carriage, may be set so as to reduce it to any thickness required, and the carriage moving by a rack and pinion, or rollers, or any lateral motion, to the edge of the knives or cutters on the periphery of the cylinder or wheels, reduces it to any given thickness. After passing the planing and reducing wheel, it then approaches, if required, two revolving cutter wheels, one for cutting the groove, and the other for cutting the rabbets, that form the tongue. One wheel is placed directly over the other, and the lateral motion moving the plank, or other material, between the grooving and rabbeting wheels, so that one edge has a groove cut the whole length, and the other edge a rabbet cut on each side, leaving a tongue to match the groove. The grooving wheel is a circular plate, fixed on an axis, with a number of cutters attached to it to project beyond the periphery of the plate, so that, when put in motion, it will perform a deep cut or groove, parallel with the face of the plank or other material. The rabbeting wheel also of similar form, having a number of cutters on each side of the plate, projecting, like those on the grooving wheel, cuts

the rabbet on each side of the edge of the plank, and leaves the tongue or match for the groove. By placing the planing wheel axis and cutter knives vertical, the same wheel will plane two planks, or other material in the same time of one, by moving the plank or other material opposite ways, and parallel with each other, against the periphery of the planing or moulding wheel. The groove and tongue may be cut in the plank or other material, at the same time, by adding a grooving and rabbeting wheel. Said William Woodworth does not claim the invention of circular saws or cutter wheels, knowing they have long been in use, but he claims as his invention the improvement and application of cutting or planing wheels to planing boards, plank, timber or other material; also his improved method of cutters for grooving, and tonguing, and cutting mouldings on wood, stone, iron, metal, or other material, and also for facing and dressing brick, as all the wheels may be used single, and separately, for moulding, or any other purpose before indicated. He also claims as his improved method the application of circular saws for reducing floor plank and other materials to a width.

 "Dated Troy, Dec. 4th, 1828.
   "William Woodworth.
 "Witnesses: Henry Everts,
   "D. S. Gleason."

The original patentee was William Woodworth, to whom the aforesaid letters patent were granted on the 27th day of December, 1828, and who died on the 9th day of February, 1839. On the 14th day of February, 1839, administration of the goods and estate of the said William Woodworth was granted in the state of New York, to his son, William W. Woodworth, who subsequently, on the 16th day of November, 1842, obtained a renewal and extension of the said letters patent for the additional term of seven years from the expiration thereof. On the 2d day of January, 1843, the said administrator disclaimed so much of the claim in the said letters patent as embraced the application of circular saws to reduce floor plank and other materials to a width; and afterwards, on the 2d day of January, 1843, he granted to William Washburn and Charles W. Brown, the present plaintiffs, certain rights, to use the said patent, by the following deed, which was duly recorded in the patent office: "This indenture of three parts, made and concluded on the second day of January, in the year eighteen hundred and forty-three, by and between William W. Woodworth of the town of Hyde Park, of the county of Dutchess, and state of New York, Esq. as he is administrator of the goods and estate, which were of William Woodworth, hereinafter mentioned, deceased, of the first part, William Washburn, and Charles W. Brown, both of Boston, in the county of Suffolk, and state of Massachusetts, carpenters, of the second part, and James G. Wilson, of the city,

county and state of New York, gentleman, of the third part, witnesseth: That whereas letters patent bearing date on the twenty-seventh day of December, in the year eighteen hundred and twenty-eight, were granted to William Woodworth, now deceased, by the United States of America, for an improvement in the method of tonguing, grooving, and cutting into mouldings, or either plank, boards, and other materials, and for reducing the same to an equal width and thickness, and also for facing and dressing brick, and cutting mouldings on, or facing metallic, mineral, or other substances. And whereas the term for which the said letters patent were granted, did expire by the limitation contained therein, on the twenty-seventh day of December now last past, and before the expiration of the said term such proceedings were had, that, pursuant to the act of congress in such case made and provided, the said letters patent were renewed and extended for the further period of seven years from and after the expiration of the said first term, the certificate of renewal whereof bearing date on the sixteenth day of November, being granted unto the party of the first part, one of the heirs, and the administrator of the said William Woodworth, deceased; and whereas the parties of the second part have paid to the party of the first part the sum of five hundred dollars, and have given to the party of the first part their negotiable promissory notes, bearing even date with these presents, one for the sum of one thousand dollars, payable in ninety days from the date thereof; one for the same sum, payable in six months from the date thereof; one for the same sum, and payable in twelve months from the date thereof; one for the same sum and payable in eighteen months from the date thereof; one for the same sum, and payable in two years from the date thereof; one for the same sum and payable in thirty months from the date thereof; and the last for the sum of five hundred dollars, payable in three years from the date thereof, and all the said seven promissory notes bearing interest from their date. And whereas, in consideration of the said money and notes, the party of the first part hath agreed to license and empower the parties of the second part to construct and use, and to license others to construct and use fifty of the said patented machines, within the counties of Suffolk and Norfolk, and in the towns of Charlestown, Cambridge, West Cambridge, Watertown, Medford, and Malden and Rockbottom village, in the county of Middlesex, in the state of Massachusetts—in such manner, nevertheless, that the license and authority so granted shall stand and be as security unto the party of the first part, and his assigns, for the payment of each and all of the said promissory notes.

"Now the said parties have covenanted, granted, and agreed in manner following: First. The party of the first part does hereby

license and empower the parties of the second part, and their executors and administrators, to construct and use fifty of the said patented machines within the territory aforesaid; and also within the same territory to license and empower other person or persons to construct and use one or more of the said patented machines, during the whole period for which the said letters patent have been granted; but the whole number of machines by the parties of the second part, and by all persons empowered by them, constructed and used during the said period in the said territory, shall not, at any one time, exceed the said number of fifty machines. And provided also, that if at any time or times the parties of the second part, or their representatives, shall make any default in the payment of the said promissory notes or either of them, it shall be lawful for the party of the first part, or his assigns, at any time while such neglect or default shall continue, to give notice in writing to the parties of the second part or their assigns, and to any person or persons, licensed and empowered by them to use the said machine, to cease and discontinue the use thereof; and if they or either of them shall fail so to do for the space of ten days after such notice, the parties of the second part hereby covenant with the party of the first part, and his assigns, that it shall be lawful for any court of equity, having jurisdiction of the premises, to enjoin the parties of the second part and their assigns, and all persons empowered by them as aforesaid, from using the said machines, until the further order of the court; and if such neglect or default should continue for the space of thirty days after such notice, it shall and may be lawful for the party of the first part, or his assigns, to sell at public auction, in the city of Boston, after advertising the same six times in some newspaper printed in the said city, all the right, title and interest which, by these presents, are in any way granted unto the said parties of the second part, and the party of the first part, or his assigns, may bid at such sale, and in the names of the parties of the second part, or their assigns, as the case may require, may convey and assure the same to the purchaser, and thereupon all license, power, and authority of the parties of the second part and their assigns, and of all persons empowered by them shall cease, and thereupon it shall and may be lawful for any court of equity having jurisdiction of the premises, perpetually to enjoin the parties of the second part and their assigns, and all persons empowered by them, from constructing or using any of the said patented machines. And the proceeds of such auction sale, after deducting all necessary expenses, shall be applied to the payment of all such of the said promissory notes as then remain unpaid, without prejudice to any remedy, which the party of the first part or his assigns may have for any balance, which may remain due to him; but if the said proceeds should be more than sufficient to pay the amounts remaining due

on the said notes, such excess is to be paid to the parties of the second part, or their representatives or assigns. Second. The parties of the first part and third part covenant with the parties of the second part, that they will institute suits at law, and in equity, against any and all person or persons who shall infringe upon the patent aforesaid, within the territory aforesaid, during the period of two years from the date hereof, upon receiving notice of such infringement from the parties of the second part, that they will prosecute the said suits at their own expense to final judgment with due diligence, and that, after deducting all the expenses of such suits, and a reasonable compensation for their own expenses, time and pains in prosecuting them, they will pay over the damages recovered therein unto the parties of the second part, or their representatives or assigns. Third. If it should be finally decided in either of the suits, commenced as aforesaid, within the said period of two years, by the highest court, to which the said parties of the first and third part, or the defendants in such suits shall carry such suit by writ of error or appeal, that the said extended and renewed letters patent are void, the parties of the second part shall be thereby released and discharged of and from the payment of all such of the said promissory notes as shall then remain unpaid; and if either of the said notes shall then be paid, the said party of the first part, and the said party of the third part, each of them, severally, and not jointly, covenants with the parties of the second part, that each of them will repay to the parties of the second part, one half of whatever sum shall have been so paid on the said notes, with interest from the several times of payment, deducting however a reasonable compensation for any benefits, profits, or advantages, which shall then have been received by the parties of the second part, under or by virtue of the license hereby granted. Fourth. The parties of the second part covenant with the parties of the first and third parts, that they will at all times, during the said term of two years, suffer and permit the parties of the first and third parts to use their names in all such suits as may be commenced as aforesaid, and that they will aid and assist the parties of the first and third parts in procuring the necessary evidence to sustain such suits when commenced. Fifth. The party of the first part covenants with the party of the second part, that he will not license and empower any person or persons to use any of the aforesaid machines within the territory before named, during the said term of seven years, for which the said letters patent have been extended; but nothing herein contained shall be so construed as to prevent the party of the first part from constructing or licensing the construction of the said machine to be used elsewhere than in the territory aforesaid.

"In testimony whereof, the said parties have set their hands and seals, on the day and

year first above written, to this and to two other instruments of like tenor and date.

> "W. W. Woodworth,
> "W. Washburn,
> "Charles W. Brown,
> "James G. Wilson.

"Sealed and delivered in presence of
"Horace Philbrook."

The plea was the general issue, and a notice of special defence was filed.

The present action is brought by the plaintiffs for an alleged violation of their right under the said deed by the defendant, and the damages were laid at $2500.

Franklin Dexter and B. R. Curtis, for plaintiffs.

C. G. Loring, Joel Giles, and W. Dehon, for defendant.

At the trial the following points were made by the counsel for the defendants:

1st. That the plaintiffs could not bring the present action, they being merely limited licensees, and not exclusive owners of a right in the patent. That under the existing patent law, the plaintiffs must be either grantees of an undivided interest in the patent, or grantees or owners of the exclusive right in the patent within a given territory. That the term "exclusive," signified the "whole" interest, which the patent conferred, and that the patentee, having reserved to himself, by a clause in the contract with the plaintiffs, the right to construct and to license others to construct these machines within the territory for which the right was granted to the plaintiffs, the plaintiffs could in no sense be considered as possessing the exclusive right.

To this it was answered, in behalf of the plaintiffs, that the person actually interested in the patent right, was authorized by law to bring an action for a violation thereof; and that although the said clause in the contract was, taken separately, ambiguous, yet that the whole covenant, and especially that portion, providing, that the parties of the first and third parts might use the name of the party of the second part, plainly indicated, that the grant was of an exclusive right; and that, if the plaintiffs could not bring the action, no one could, for they were the only parties having an exclusive right and interest.

STORY, Circuit Justice. The language of the patent act, of 1836, § 11 [5 Stat. 121], refers to the grant of an exclusive right in a patent, and the term "exclusive" comprehends not only an exclusive right to the whole patent, but an exclusive right to the patent in a particular section of country. The action for the violation of an exclusive right is confined to the owner of such a right. But the right granted to the plaintiffs in this case is exclusive, for the limitation of the number of the machines does not destroy the character of that right. That the exclusive right in certain territories does exist in the assignees, is clearly indicated by the fourth clause in the indenture, and

the grant of such a right is not inconsistent with the reservation, that the grantor might construct machines there, because he might do that by way of a license reserved to him under his assignees. The present judgment of the court is, that the grant to the assignees is of an exclusive right, and suits are to be brought in the name of the assignees, but at the expense of the grantor.

The second point raised by the defendants' counsel, was that, under the patent laws, nobody but the patentee was entitled to an extension or renewal of the patent, and that in this case, the patentee having died previous to such an extension, no one else was authorized to procure it. That such a right was nowhere given by the statute to the legal representative of a patentee, but solely and exclusively to the patentee himself, and that it was manifest, from all previous and subsequent legislation in the United States, that the absence of any such provision was not an accidental omission, but the result of design. That the right of renewal was intended as a personal privilege of the patentee alone.

To this point, it was answered by the counsel for the plaintiffs, that no new patent was issued, and no new right granted, but that there was a mere extension of an existing right for an increased length of time. That the design and policy of the act were to reward the inventor by securing to him, his family and representatives, the benefit of the invention, and consequently the grant was to him, his heirs, administrators, or assigns; and that this policy was inconsistent with the idea, that the benefit of his invention was to be strictly limited to the inventor. That there was nothing in the statute of 1832 [4 Stat. 559] to show, that an assignee was not entitled to a renewal; and that the counsel for the defendant had confounded the term "patentee" with that of "inventor," and assumed what the law did not, that one must necessarily be the other. But that, in point of fact, the term "patentee" applied to any person having a right under the patent, whether as executor, administrator, or assignee. That the right of the original grantee to make a contract for the renewed right, clearly established his power to make a valid assignment of all his rights and privileges in the patent; for it was not possible, that congress could have designed, that the death of the patentee should operate to put an end to that right, when vested in his grantee. That the application for the patent must, indeed, be in the name of the patentee, and that the holder of the legal interest must apply for it, and then that it would enure to the holder of the beneficial interest. That such was the practice of the board of commissioners for patents, and that such had been decided to be the law by Judge Thompson, in the case of Van Hook v. Scudder [Case No. 16,853], which was subsequently reaffirmed by him. That an injunction had been granted by Judge McKinley on the same ground; and that the same doctrine had been affirmed by Judge

McLean in the case of Brooks v. Bicknell [Id. 1,945].

STORY, Circuit Justice. The rule of comity always observed by the justices of the supreme court in cases, which admitted of being carried before the whole court, was to conform to the opinions of each other, if any had been given. Such decisions amounted to authority, which, though not conclusive, were operative, whenever the question should be carried up; and therefore, although his mind was not without much difficulty on this point, he should rule for the plaintiffs, in conformity with the opinion of Mr. Justice McLean.

3d. Another point made by the defendants was, that as the drawings of Woodworth's machine were not referred to in the specification, they could not be used to explain, aid, or enlarge it. This point was elaborately argued on both sides, and was ruled by THE COURT in favor of the plaintiffs, in accordance with the decision of Mr. Justice McLean, in Brooks v. Bicknell [supra].

4th. Another point contended for by the defendants was, that all parts of Woodworth's machine were previously known, and could be found described in Bentham's specification.

STORY, Circuit Justice. The law is, that whoever first perfects a machine, is entitled to the patent, and is the real inventor, although others may previously have had the idea, and made some experiments towards putting it in practice. In England, the law goes even so far as to grant such an one the patent, although the antecedent experiments of others were known to and used by him in perfecting his machine. The law in this country has not gone quite so far, but I do not mean to say, that there would be any difficulty in going to that extent. At any rate, he is the inventor, and is entitled to the patent, who first brought the machine to perfection, and made it capable of useful operation.

Various other points were made by the defendant, which, together with the ruling of the court, are sufficiently stated in the charge and in the opinion on the motion for a new trial. Much evidence was introduced by the defendant, to prove the vagueness and insufficiency of Woodworth's specification; and also to prove, that every thing claimed by Woodworth was to be found in the specification of the patent granted to Samuel Bentham, in England, April 23d, 1793, and printed in the Repertory of Arts and Manufacture, vol. 10, published in London, A. D. 1799; also in the specification of the patent granted to Bramah in England, A. D. 1802, and published in 28 Rees, Enc.; also in the specification of the patent granted to Malcom Muir, of the city of Glasgow in Scotland, dated June 1, A. D. 1827, an abstract of which was published in the London Journal of Arts (second series) vol. 2, p. 68, and a notice whereof was published in the United States, in the Franklin Journal, vol.

1, for A. D. 1828; also in the specification of the patent granted in the United States, to James Collins of Anson, in the state of Maine, A. D. 1827, for shearing cloth by revolving shears. In rebutter of which, much evidence was also introduced on behalf of the plaintiffs.

In the course of the trial, the following question was suggested by the counsel for the defendants: Whether a license purchased under the original patent, would cease on the expiration of the patent, or continue in force during the subsequent extension.

STORY, Circuit Justice. I have an impression, but it is not a very distinct one, that some question of an analogous nature arose under the act of congress for the renewal of the patent of Oliver Evans,—Act 21st Jan., 1808, c. 117 [4 Bior. & D.'s Laws. 135; 6 Stat. 70].— which was, of course, governed by the old acts of 1793 and 1800 [1 Stat. 318; 2 Stat. 37]; and that it was then held, that any future use of the patented machine of Evans, after the renewal, except so far as it was saved by the proviso of that act, would be an infringement of his patent. Whether that applied to cases of licensees, I do not exactly remember.[2] But I have had occasion recently to decide the very point, in a case in Maine, in respect to a licensee. And I there held, upon full consideration, that every license, or assignment, under the old laws, before the act of 1836, expired with the limitation of the original patent, unless it was expressly in terms so granted as to be applicable to any renewal of the patent afterwards. The decision of the court proceeded upon the ground, that under the old laws, before the act of 1836, the licensee's, or assignee's right, was necessarily bounded by the same limits as that of the licensor, or patentee,—that is to say, to the original term granted by the patent to the licensor or patentee. If, afterwards, the patent was renewed, it was a new grant independent of the old, and the patentee was entitled to the sole and exclusive benefit thereof, unless the licensees or assignees under them had, by their original contract, secured to themselves by express covenant or grant, a right to the benefit of the renewed patent.

STORY, Circuit Justice (charging jury). This is a case, gentlemen of the jury, which, as you are well aware, has taken up a vast deal of time and attention. And, indeed, I may truly say, that it has been the most protracted civil cause ever tried in this court. Undoubtedly this planing machine is an invention of great utility, and the patent right, therefore, is the more likely to be contested; and it often happens, that in this class of actions, many points are made in the opening and perhaps much dwelt upon in the trial, which ultimately prove of small importance, and are abandoned or waived in the sequel. You have seen this in the present case. I do not feel called upon to go into any minute dis-

[2] The case referred to, probably, was Evans v. Jordan, 9 Cranch [13 U. S.] 199.

cussion of the points raised here, for after the full and elaborate arguments of the counsel, I could not aid your judgments by going over the whole ground; and shall only present to you a general view of the mass of the evidence, as it has been given. But before doing this, I shall take notice of what has been entirely omitted on each side. Not a word has been said as to the amount of damages, in case the verdict should be in favor of the plaintiffs. And this has been omitted, on the long-settled and very proper ground, that whenever a patent right is contested here for the first time— fully and fairly contested—it is only for the sake of determining whether the patent be valid or not. If its validity be sustained, then the patentee can obtain from the equity side of the court, an injunction to restrain a party from using the invention to the injury of the owner. Still it is your duty, if you find for the plaintiff, to give him such reasonable damages—not vindictive—but such as are not covered by any of the costs he will recover, to indemnify him for the necessary and unavoidable expenses of establishing his right. Observe, you are not always bound to do this; for I can conceive of cases, where only nominal damages should be rendered; as where a patentee fraudulently leads a party to infringe on his right, and then brings an action against him merely to gratify his own malice or revenge. But you should suffer no valid patent to go out of court without indemnifying the owner for his reasonable and necessary charges in establishing his true right; in other words, he should not be sent away worse than he came into court. Therefore, if you find for the plaintiffs, you will award• such damages as you think them fairly and reasonably entitled to, under all the circumstances.

A considerable number of questions of law have been raised by the defendant, and reduced to writing, most of which have been disposed of, but which I will recapitulate before coming to the matters of fact. These questions are stated as follows:

1st. That the grant of an extension of patent to an administrator, is not within the statute of 1836. This point is overruled.

2d. That plaintiffs have not such title to any exclusive right as enables them to maintain this action under the indenture in their declaration mentioned. Overruled.

3d. That the patent was void at the time when, and from which, the contract between the plaintiffs and the administrator, and Wilson, took effect; because it purports to grant a right under the patent, as including the circular saw, which is disclaimed,· and admitted not to be valid; and at the time of the date of said contract, the disclaimer of the circular saw had not been filed or recorded. Overruled.

4th. That the contract between the patentee and Strong. on one part, and Emmons and Toogood and others, of the other part, avoids both patents, being a mutual admission. that neither patent was good, because purporting. that each was of equal validity, whereas both could not

be good; and because such contract operates as a fraud on the public. Overruled as an admission in point of law. And I hold that the occasion of the contract may be established by other evidence, and the reasons why it was entered into; and if the jury believes the evidence on this point in the case, the contract was a compromise on both sides, without any admission of, or intent to admit, on either side, the invalidity of the patent.

5th. That the surrender of the patent by the administrator defeated the title of plaintiffs. Overruled.

6th. That the patent is imperfect and void, for the want of suitable drawings and references, and that if the drawings may be referred to, they should be as composing part of the description, and not part of the claim. Overruled. The drawings are to be treated as part of the written specification, and may be referred to, to show the nature, and character, and extent of the claim, as well as to compose a part of the description.

7th. That the patent is void, for uncertainty and ambiguity in the description; and also for uncertainty and ambiguity in the claim. Answer. Whether the patent is void for uncertainty and ambiguity in the description, is a matter of fact to be decided upon the evidence of experts. The patent is not void for uncertainty and ambiguity in the claim, for the written specification of the claim may be, and is, aided by reference to the drawings. Upon examining the written specification, in connexion with the drawings, the claim, so far as it is a matter of law, must be deemed to be a claim for an improved machine, as described in the written specification and drawings.

8th. That the patent is void for multiplicity of claim. Overruled.

9th. That the patent is void for falsity of claim. Answer. This is not a mere matter of law, but involves matters of fact.

10th. That the disclaimer of the circular saw was not made within a reasonable time. Answer. This is not a mere matter of law in this case, but is to be judged of with reference to all the circumstances in evidence.

11th. That the claim stated by the counsel as that relied on in this trial, "as one for the whole machine or apparatus as an improved machine, capable of three distinct operations, or of producing three results. to wit: planing, tonguing and grooving at the same time in the manner described; and also of performing each of those operations, or producing each of those results separately, in the manner described," is not set forth in the specification; or. in other words, that the claim therein stated is not reasonably susceptible of this construction. Overruled, as a matter of law. The drawings are to be deemed a part of the specification, and taking the whole together, the patent is for an improved machine. and. as such, is not open to the objection stated.

12th. That the drawings cannot be referred to for the purpose of adding any thing to the specification or claim not specifically contained

or mentioned therein; so that if top pressure rollers be not described in the specification, recourse cannot be had to the drawings to supply or describe them, as making part of the specification or claim. Overruled. The drawings are to be deemed a part of the specification, and may be referred to for the purpose suggested in the objection.

13th. That the specification and drawings do not contain any description or claim of top pressure rollers with such reasonable certainty and precision, as the law requires, to constitute a valid claim therefor, as a part of the machine described, either separately or in combination with the cutting wheel. Answer. This is not a matter of law, but involves a matter of fact, as to the certainty and sufficiency of the description, in the particulars mentioned.

14th. That the patent cannot be maintained for a mere combination or connexion of the top pressure rollers with the rotary cutting wheel, because the claim set forth in the specification, and as made by counsel, described and embraced an organized machine, designed to be used in many cases without them, and where they cannot be applied. Answer. This is not a mere matter of law, but involves matter of fact. The patent is not understood by the court to be for a mere combination or connexion of the top pressure rollers with the rotary wheel, considered alone per sese, but in combination with other parts of the machine; and whether the top pressure rollers can be applied, or not, for all the uses described in the specification and drawings, is a matter of fact for the consideration of the jury.

15th. That if top pressure rollers for the purpose of confining the plank to the carriage, are embraced in the patent, nevertheless the defendant has not infringed, because he uses rollers, only for the purpose of feeding, and not for the purpose of confining the material to the carriage, as he uses no carriage; and the incidental effect of their serving as pressure rollers, if they do so, is no infringement of their patent, because the specification admits of feeding rollers as one means of lateral motion not claimed as an invention. Answer. This is a question of fact for the consideration of the jury.

16th. If plaintiffs have a valid patent for the organized machine described therein, the defendant has not infringed upon it; because the machine used by defendant is substantially different from that patented, the machine patented having as a part of its specified organization, a carriage, which is essential to many of the operations, which it is described as designed to perform, and several of which it cannot perform with the use of feeding rollers, and to which carriage alone the moving power is directed to be applied, and which carriage is described and pointed out as the only means of adjusting the material or machine for producing the various thicknesses that may be required; whereas the machine of defendant has no carriage, but applies the moving power always directly to the material, and no carriage can ever be useful for the purpose, for which it is constructed and used, and the adjustment for producing various thicknesses is regulated by means of boxes and apparatus applied to the cutting wheel for the purpose of raising or depressing it, as occasion may require. Answer. This, likewise, is a question of fact.

17th. Plaintiffs' claim is for a combination of machines, or mechanical means, all old, and none applied to a new use, and is not for an organized machine embracing any new part or parts put to new uses, and is, therefore, for a combination merely, and unless we infringe the whole, we do not violate the patent. Answer. This is not a mere matter of law. The court cannot judicially know, whether the machine patented is composed of parts, none of which are substantially new in their application.

18th. That the patent in this case, according to the specification and claim as therein contained and stated by the counsel, is not for any particular form or construction of a rotating cutting wheel, nor for any particular form of platform, nor for any particular form of carriage, nor for any particular mode of effecting the lateral motion of the carriage to the cutting wheel; and therefore, that if any machine described in Bentham's patent, or either of those testified to by Blanchard, was composed of a platform or bench with a sliding bed or carriage to which the material was attached, and which carriage was moved by any lateral motion to and along the cutting wheel, in such manner as that the surface of the material was cut, or planed, or reduced by the cutter wheel, and such machines were, in these respects, suitable for that purpose, then the defendant has not infringed the patent of the plaintiffs in these particulars or either of them. Answer. This is also not a mere matter of law, but involves facts, and skill and knowledge in mechanics. The jury must decide on the facts.

Having thus disposed of the questions of law, we come to those of fact relied upon by defendant, which naturally arrange themselves in four classes. The defendant alleges: 1st. That Woodworth's specification is too vague to enable a competent mechanic to construct a machine from it. 2d. That the invention was not new on the part of Woodworth, but previously known both to Bentham and Blanchard, the former having described it in his specification, and the latter having actually carried it into effect. 3d. That Gould's machine is substantially different from Woodworth's; and, as auxiliary to this, 4th. That Woodworth did not contemplate feeding rollers as a mode of operating his machine.

Now, gentlemen, it is for you to say, whether the invention belonged to Woodworth, or whether the planing machine was known and used prior to the issue of his patent. If

you think the latter, you need go no further, but find for the defendant at once. But as to this point, the burden of proof rests upon the defendant. He must satisfy you beyond a reasonable doubt, that there was a prior invention to Woodworth's, because the plaintiff has a right to rest upon his patent for his invention, till its validity is overthrown. And consequently, if it should so happen, that your minds are led to a reasonable doubt on the question. inasmuch as it is incumbent on the defendant to satisfy you beyond that doubt, you will find for the plaintiff so far as this point is concerned. In relation to this alleged priority of invention, there are but two modes in which it is attempted to be made out; viz. by Bentham's description, and by Blanchard's machine. Blanchard refers us to 1822–23, and gives a description of a machine, which he then constructed and used to plane blocks and gunstocks. He used a roller, to which knives were attached, but he did not use it long. In answer to a direct question put by the court, he said his machine was not like the one in evidence, and, as I understood, did not pretend, that he ever made a machine, which operated substantially by the same means as Woodworth's. He considered the movements of all these machines the same, but the means of operation different. But if the means are substantially different in any supposed cases, then there is or may be invention. The spinning machinery now so universal is an example of this; and the complicated means now used to produce the same result, formerly obtained by hand labor, and with infinitely more rapidity and regularity, no one will deny to be a great invention. Blanchard's machine was burnt, and we have nothing now before us, but his recollection of what it was; and it is for you to say, whether he has satisfied you, that it was substantially the same invention as Woodworth's. It is probable, however, that you will find it necessary to go further, and look into Bentham's description, which has been so copiously commented on in this case. For one, I do not comprehend a tithe of what may be found there; but the question is for your judgments, aided by the testimony of the experts, whether Woodworth's planing machine is contained in that description. Now, you have found, that the experts are not agreed, and, indeed, in the course of thirty years' experience, I have never, I think, known them to agree in opinion, as to whether any machine was really an invention or not. You will weigh their testimony and give it its proper effect. The whole argument, in regard to Bentham, turns on this question. Does he substantially describe, not a machine by which planing may be done, but a machine like the plaintiffs'? He does describe various things, which will accomplish various purposes. But the question is not, whether by using some parts of his invention we may make a machine, which will plane, but whether that machine will be substantially the same as the one Woodworth patented. That is the sole question; for he may have suggested fifty different modes or methods of planing, and still if this very mode be not there, it cannot be properly said, that he has described the plaintiffs' machine. You must see, in effect. that this same machine was substantially in Bentham's eye when writing his specification. and would be in the eye of an expert on reading it. I am not mechanic enough to aid you in explaining that specification; but you have heard several of the plaintiff's witnesses testify, that they could not discern this machine in it, that they could not make it from it. They are all able and ingenious men. Mr. Keller, whose opinion may well be regarded as of the very highest authority, since it is impossible for any man to have a more weighty experience on this subject, he having for so long incessantly devoted his attention to machinery and to patents,—Mr. Keller tells you distinctly, that there is no such machine as Woodworth's in Bentham's specification. On the other hand, Mr. Adams, also an extremely able and experienced man, states directly the contrary. And so of the others. You will remember the names of the witnesses on the one side and on the other, and also the diversity of their opinions on this point. Now, after all, in relation to this various evidence, all honestly and clearly given, by men of great skill and ability, what is your conclusion? Have you evidence. which leaves no reasonable doubt in your minds, that Bentham really does substantially describe Woodworth's machine?

Upon this point, the counsel for the plaintiff made a suggestion, towards the close of his argument, which struck the court as possessing great force. Bentham's specification was known and filed so early as 1793, while Woodworth's patent was not taken out till 1828. It is universally admitted, that the planing machine is a most valuable invention. The counsel have said, indeed. that it is the most valuable of all, which have been made; and though, for myself, I should scarcely go so far as that, but regard the cotton-gin, next after Fulton's wonderful invention of the steamboat, whose incalculable benefits the whole civilized world is every day experiencing, in the comparative annihilation of distance and time, and the consequent advancement of human improvement, as perhaps the most important invention within my knowledge; still I can have no hesitation in conforming to the general high estimate of the importance and utility of the planing machine. But in the best scientific works of the day, no planing machine like Woodworth's was ever alluded to, till after his patent was taken out, though Bentham's specification was constantly spoken of, and the planing machine he patented in 1791 was well known and is described. Now, with so many ingenious and inquiring minds constantly at work upon the construction and improvement of machinery, both in

Great Britain and America, all having easy access to well known publications relating to science and the arts, how could it have happened, that down to the year 1828, no man should ever construct this machine from Bentham's specification of 1793, if it is so clearly to be found therein? Why should it be, that for a period of thirty-five years, not a man in America or England, dreamt of constructing this machine, which has proved of such vast utility, from Bentham, if Bentham really had described it? Certainly, it could not have been from ignorance of the specification, for the Repertory of Arts, in which it was published, was a work of much authority in England, and was, besides, as well known here, as on the other side of the Atlantic. This seems to me a fact of great importance, though I have no right to say, how far it ought to affect your minds. But is not this total silence for so long a time, a circumstance, which may naturally aid you in forming a conclusion on this controverted point? And if, as I have before said, you are in doubt, your verdict in regard to this point must be for the plaintiffs.

But the great question of the case is, as indeed from an early period of the trial I thought it would be, this: Is the machine used by the defendant, substantially the machine, which Woodworth invented? And in regard to this, likewise, there is very great diversity in the testimony of the experts. At the opening for the plaintiff, four or five very intelligent men gave their evidence, that there is no substantial difference between the two; that a portion of the apparatus is different, but that substantially the mode of operation is the same; and that, in truth, the substance of defendant's machine is Woodworth's invention. But on the other hand, the testimony is just as positive, explicit, and strong the other way. And the burden here is upon the plaintiff, who must show, that there has been an infringement upon his right. This is a point, which will merit and require your deliberate and careful attention. Woodworth's claim is substantially for a planing machine; for a mode of accomplishing a particular end by certain means; and to maintain his case, the plaintiff must show, that there has been a substantial invasion of his machine by the defendant. There are various modes of operation mentioned in Woodworth's specification. He speaks in the first place of "rack and pinion," but does not confine himself to that means; for he says the carriage may be moved "by rollers, or by any lateral motion, to the edge of the knives or cutters." You will observe, that he contemplates the use of knives, as distinct from teeth or burrs. He speaks likewise of a carriage, throughout. He "does not claim the invention of circular saws, or cutter wheels," but he does claim "the improvement and application of cutter or planing wheels to planing boards, plank, timber, or other material." His claims, in effect, may be stated thus: "I claim this planing apparatus as my invention; but though I have pointed out one particular mode of

29 FED. CAS.—21

operating it, I do not confine myself to that mode, but mention, that any lateral motion may be employed to advance the work to the cutting wheel." Now, if Gould in his machine only dispensed with the rack and pinion, still continuing to use the carriage, beyond all question there would be a plain invasion; for the rack and pinion are not made essential to the machine. It is true, that Woodworth always speaks of a carriage. There is nothing to show that he ever dispenses with it. But he says, that the movement may be given to the carriage by any of various ways. And here arises the question, whether, if an invention in the aggregate be new, and a party omits one part of the machine always used by the inventor, such mere omission will operate to deprive the inventor of his patent right? But the real pinch of this part of the case, is in this inquiry: Does the defendant, in using a part of Woodworth's machine, adopt a mode of movement essentially different from that pointed out by the inventor, or is that mode substantially within the scope of the invention?

Woodworth speaks throughout of a carriage. Gould does not use any carriage, in the technical sense of the term, but employs a platform. He uses feeding rollers to conduct the work of the cutters. He has no rack and pinion, for none is necessary. And his argument is, that as he uses merely feeding rollers, without a carriage, he employs a mode of operation not at all indicated in Woodworth's specification, and substantially different from moving a carriage by rollers or any other lateral motion. If there is this essential difference, the case is his. But if you are satisfied, that this principle of feeding rollers is substantially embraced in the specification and drawings, a mere change in the form or position of the rollers will not change the character of the patentee's right. The defendant contends, that neither in the specification nor the drawings, is there any reference to rollers as a moving power, distinct from a carriage: that feeding rollers, as such, are nowhere pointed out; and that the rollers, which are to be found in Woodworth, are merely friction or guiding rollers. On the other side, the plaintiff maintains, that even in the vertical machine represented in the drawings, the rollers are pressure rollers; that in changing the machine to a horizontal form, which the inventor expressly indicates may be done, they would operate as feeding rollers; and that any competent mechanic would understand them as so intended, and would contrive means to make them rise and fall, as necessary to produce the very result contemplated by the inventor. Now, are these rollers, as to this mode of operation, substantially described in the patent? The language relates to rollers generally. Their use is not pointed out in words, except so far as it mentioned, that the motion of the carriage may be given by rollers. Supposing the machine to be horizontal, say the plaintiffs' counsel, what office would these rollers perform? Those below the

plank, by being geared, would produce its motion to the cutter wheel; those above the plank and beyond the wheel would serve to keep it steady, and would operate as pressure rollers to the extent necessary for that object. So that in point of fact, the rollers above and below would operate as, and would be, feeding rollers. If it is true, that the rollers indicated in the drawings would perform this office, were the machine horizontal, and if a skilful machinist would know, that they necessarily must perform it, and would therefore give them the necessary means of adjustment to produce the intended result—then the point appears to be with the plaintiff. But the counsel on the other side take the opposite ground, and maintain that nothing is to be applied in the horizontal machine except in the precise manner, in which it is indicated to be applied in the vertical; that the vertical rollers are not geared in the drawings, and therefore we cannot suppose the inventor intended, that gearing should be given to the horizontal. I am not sufficiently acquainted with mechanical science to be able to decide about this; but I can scarcely think it an unreasonable supposition, that, where an inventor contemplates different forms and positions of his machine from that in which he describes it, a skilful machinist, in making the change of form, would also make the requisite changes in the parts, from his own knowledge. But there is a good deal of forcible argument on the part of the defendant, that these vertical rollers could never have been intended as feeding rollers, and that they could not perform such an office; though it is unnecessary to dwell on that part of the argument, founded on the want of top-journals in the drawing, because any skilful mechanic in building the machine would naturally, and almost of course, confine the rollers at both ends, whether they were intended for feeding, or pressure, or guiding rollers. And as to the rollers in the drawings, which are represented as beyond the cutting cylinder, the plaintiff says, as we have seen, that they are pressure rollers to some extent, and were meant as such; while the defendant again contends, that in the vertical machine they are guides merely, and in the horizontal machine would be nothing but the same guides. That is a question for your consideration, for on this point you are better judges than I possibly could be. That in the vertical machine with the carriage they are friction rollers in form, is, however, of no importance; for a change of form is not a change of substance. The defendant admits, too, that incidentally his feeding rollers comprehend, to some extent, pressure rollers. It is clear they must. But he alleges that their primary object is to draw the work along to the cutting cylinder, and that the character of pressure rollers is but an incidental, though necessary, result of their office. But on the other hand, the argument is just as good for the plaintiff, that his pressure rollers incidentally comprehend feeding rollers, and would operate to feed the work to the cutting wheel.

But again. Is the carriage, in Woodworth's specification, treated of as an essential and indispensable part of the invention, or might the machine be complete without the carriage, and by the substitution of some other means? If in all cases the inventor contemplated the use of a carriage, and of no other means, and if the defendant in dispensing with it thereby employs what the inventor never thought of, that is a good ground of defence. You are the judges of this; and if you find, that defendant's feeding rollers are not substantially in the patent, and that the carriage is an essential part of the Woodworth machine, your verdict, in that respect, must be for the defendant.

But then comes another consideration. Admitting all this to be true, as the defendant alleges, is there any other part of Woodworth's machine, on which he has infringed? Because, if his dispensing with the carriage and using the feeding rollers constitute the only differences in the two machines, and if the rest be the invention of Woodworth, not known before, then Gould has merely improved upon Woodworth, and has no right to use Woodworth's invention, up to the point where the difference commences. He might, to be sure, have a clear title to a patent for his improvement, but it must be as an improvement; and it would give him no authority to use the other parts of the machine, which Woodworth invented. Therefore it is not sufficient for him to show that his machine is a great deal better than Woodworth's; he must establish the fact, that he uses nothing, which Woodworth invented. Now, he does not use Woodworth's carriage, nor the rack and pinion, nor his pressure rollers, except in so far as his feeding rollers are necessarily pressure rollers. What of his then does he use? The cutters. No particular form of the cutting knives is mentioned in Woodworth's specification; nor was it necessary, because a change in the form, while the principle remains the same, will not escape a violation of patent right.

The question here for the jury to determine is, whether the defendant's improvement is made on the plaintiff's machine as a whole, by taking out part and substituting something better, but still retaining a part, or parts of the original invention; or whether the plaintiff's machine is a mere aggregate, a congregation of parts, all old in themselves, constituting a unit, to which the carriage, in combination with a rack and pinion, or rollers, or some lateral motion, is absolutely essential; and which unit, defendant has not invaded because he dispenses with some of its indispensable constituent parts. If you think, that there is any such invention, on the whole, as the patentee claims, and that defendant's alterations in the machine are mere improvements, but that the residue in the aggregate is the invention of the patentee, and was not known before him, then your verdict will be for the plaintiffs. The dif-

ficulty lies in saying, where the invention was; and you are to consider, whether, taking out the carriage, this machine in its other parts was an invention of those parts, or any of them, or whether it was merely a combination or aggregate. I confess, that my impression has been, that Woodworth meant his claim to be for an aggregate machine, but such is its obscurity, that I am unable to say, decidedly, what, in this respect, he did mean it to be. If you should be of opinion, that the original machine is composed of parts, all of which were known before, and that Woodworth's invention was merely of a new aggregate or combination of those parts, to which the carriage was indispensable, you will find for the defendant. But if on the contrary, you think, that the defendant uses parts of Woodworth's real invention, or if his machine is but an improvement on the original, and not substantially and essentially different from it, the verdict should be for the plaintiffs.

I do not know, gentlemen, that, by saying any thing more, I could aid you at all in coming to a conclusion, and indeed I fear, that I have not made myself so clearly understood throughout, as I could desire. But before leaving the case in your hands, I must take notice of the point of law, upon which the plaintiff's counsel have asked me to instruct you. The ground they take I consider clearly correct, and you will therefore regard it as the law, that the plaintiff's patent is not avoided by the publication of Bentham's specification, unless you are satisfied, that that specification contains an intelligible description of an organized machine, fit for the planing of plank or boards, substantially like plaintiff's; and that if every part of plaintiff's machine can be found described in Bentham's specification as parts of other machines, but not as combined in one machine in such a manner as to be fit for planing boards and plank, it will not avoid the plaintiff's patent.

The jury rendered a verdict for plaintiffs, with $50 damages.

On a subsequent day, a bill of equity was filed, setting forth the facts heretofore stated, and praying, that an injunction should be issued against the defendants, to restrain them from the further use of the machines, which were the subject of the present patent. Two motions were made, one on the law side of the court for a new trial, and the other on the equity side of the court for an injunction,—which were both argued at the same time.

The motion for a new trial was as follows:

William Washburn et al. v. James Gould.

And now after verdict and before judgment, the defendant respectfully prays this honorable court, that a new trial may be granted to him for the following reasons:

1st. Because the honorable judge, who presided at the trial, instructed the jury as a matter of law, that the plaintiffs under their indenture with the administrator of the patentee and Wilson, mentioned in the declaration, had title to such an exclusive right as would enable them to maintain this action.

2d. Because the honorable judge, who presided at the trial, instructed the jury as matter of law, that the patent was not void at the time when and from which, the indenture between the plaintiffs and the administrator and Wilson took effect, by reason of its purporting to grant a right under the patent, as including the circular saw, which was afterward disclaimed, and is admitted not to be valid; and which disclaimer at the time of the date of said contract had not been filed. Whereas the jury should have been instructed, that the patent was void, because at the time of the date of said indenture, when and from which said indenture took effect, it purported to grant a right under the patent, as including the circular saw, which has since been disclaimed and is admitted not to be valid; but which disclaimer had not been filed according to law at the time of the date of said indenture.

3d. Because the honorable judge, who presided at the trial, refused to instruct the jury, that the patent was imperfect and void for want of suitable drawings and references, and that if the drawings may be referred to, they should be as composing part of the description and not part of the claim.

4th. Because the honorable judge, who presided at the trial, instructed the jury as matter of law, that the patent was not void, for ambiguity and uncertainty in the claim.

5th. Because the honorable judge, who presided at the trial, refused to instruct the jury as prayed for by defendant's counsel, that the patent was void for multiplicity of claim.

6th. Because the honorable judge, who presided at the trial, refused to instruct the jury as matter of law, that the drawings could not be referred to for the purpose of adding any thing to the description or claim, not specifically mentioned therein; so that if top pressure rollers were not described in the specification, recourse could not be had to the drawings to supply or describe them, as making part of the specification; whereas the jury should have been instructed as prayed for by defendant's counsel.

7th. Because the honorable judge, who presided at the trial, refused to instruct the jury, that if top pressure rollers were embraced in the patent, for the purpose of confining the plank to the carriage, nevertheless defendant had not infringed in that respect, if he used rollers only for the purpose of feeding, and not for the purpose of confining the material to the carriage, and that the incidental effect of their serving as pressure rollers, if they did so, would not be an infringement of the patent, as the specification admitted, of feeding rollers as one means of lateral motion not claimed as new: whereas the jury

should have been instructed as prayed for by defendant's counsel.

8th. Because the honorable judge, who presided at the trial, refused to instruct the jury, that if the plaintiffs' machine consisted of a composition of machines or mechanical means, all old and none applied to new uses; and did not embrace any new parts, or parts put to new uses; it was in point of law a claim for a combination; and that if the defendants did not use the whole combination they did not infringe; whereas the jury should have been so instructed as prayed for by defendant's counsel.

9th. Because the honorable judge, who presided at the trial, refused to instruct the jury, as prayed for by defendant's counsel, that the patent, according to the specification and claim, as therein contained, was not for any particular form or combination of a rotary cutting cylinder—nor for any particular form of platform, nor for any particular form of carriage, nor for any particular mode of effecting the lateral motion of the carriage to the cutting wheel, and therefore, that if any machine described in Bentham's patent, or either of those testified to by Blanchard, was composed of a platform or bench, with a sliding bed or carriage, to which the material was attached, and which carriage was moved by any lateral motion to and along the cutting wheel, in such manner as that the surface of the material was cut or planed or reduced by the cutter wheel, and that such machines were suitable for that purpose, then, the defendant had not infringed the patent in these particulars or any of them.

10th. Because the honorable judge, who presided at the trial, instructed the jury that the plaintiffs' patent was not avoided by the publication of Bentham's specification, unless the jury were satisfied, that the specification contained an intelligible description of an organized machine fit for the planing of plank or board, substantially like the plaintiff's. And that if any parts of the plaintiffs' machine could be found described in Bentham's specification as parts of other machines, but not as combined in one machine in such a manner as to be fit for planing boards and plank, it would not avoid plaintiffs' patent.

11th. Because the honorable judge, who presided at the trial, omitted to construe the claim set forth and made by the patentee, but left it to the jury to decide, whether or not the claim was for an organized machine or for a combination merely.

12th. Because the honorable judge, who presided at the trial, instructed the jury, that it was not sufficient for defendant to show, that defendant's machine was a great deal better than Woodworth's, but the defendant must establish the fact, that he used nothing, that Woodworth had invented. That defendant did not use his carriage, nor rack and pinion, nor his pressure rollers, excepting in so far as his feeding rollers were pressure rollers, but that he did use the cutters. That no par-

ticular form of cutter knives was mentioned in this specification. Nor was it necessary, because a change in form, while the principle remains the same, would not escape a violation of the patent right: by means whereof the jury were led to understand, that the use of a cutting roller by the defendant was a violation of the right claimed by plaintiff.

13th. Because, by the course and result of the trial, the defendant is precluded from carrying up for final decision in the supreme court, the points of law, which were ruled against him for the purposes of the trial.

14th. Because the verdict was against the weight of evidence.

15th. Because of the discovery since the trial of new evidence, which defendant is advised, is material to the right decision of the case.

In support of this last point of his motion for a new trial, the defendant stated, that he should rely chiefly, but not exclusively, upon the deposition of Isaac Adams, the evidence of Thomas Blanchard, Charles M. Keller, and the charge of the judge, as published; and that, the new evidence would be disclosed in the affidavit of Daniel Dunbar, to be filed in the equity suit, on plaintiffs' motion for an injunction, to be heard at the same time as the above motion for a new trial.

The motion for a new trial was then briefly spoken to by the counsel on both sides. Upon the motion for an injunction,

B. R. Curtis, for plaintiffs, argued, that the injunction should be granted upon three grounds: 1st. Because of the long possession by the patentee and his assigns under the patent; to which point he cited Bolton v. Bull, 3 Ves. 140; Universities of Oxford v. Richardson, 6 Ves. 707; Harmer v. Plane, 14 Ves. 130. 2d. Because of the renewal of the patent by the board of commissioners, which was a strong circumstance to show, that the possession was lawful. 3d. Because of the verdict in the trial at law, which was a decisive reason, why it should be granted; and to this point he cited Bolton v. Bull, 3 Ves. 140.

Dehon & Giles, for defendant, argued, that the possession, which would entitle a party to an injunction, must be long and undisputed; whereas the present patent had been disputed. To this point was cited Collard v. Allison, 4 Mylne & C. 487; Hill v. Thompson, 3 Mer. 622.

STORY, Circuit Justice. After the very elaborate arguments had at the trial at law in this case, and unexampled in length in this court, I do not deem it fit or proper to go over the various grounds for a new trial, which have again been argued at large at the bar. Some of the questions, which then occurred, were new to my mind, and upon which I entertained considerable doubts; but, after all, I then pronounced the opinion respecting them, which upon the fullest reflection I entertained. These doubts, whatever they were, have not been strengthened by the arguments since had. On the contrary I must say, that I have since felt

far greater difficulties in supporting the opposite conclusions. And on the whole, I wish now to say, that I feel no inclination to change those opinions. As to the points, which had been ruled by my brethren on other circuits, and which I adopted from that just comity, which belongs to their learning and ability, and which has long been adopted as a fit rule to govern me in my circuits, since I know of no higher authority except that of the supreme court of the United States, I shall continue to adhere to their doctrine, as I have not the presumption to suppose my own judgment entitled to more weight than theirs.

There are a few grounds only, upon which I shall deem it necessary to add any thing beyond what was suggested at the trial. In the first place, as to the supposed surprise by new evidence on the part of the defendant, not known to him at the time of the trial. Several answers may be justly given to this suggestion, but I shall limit myself to two. The first is, that, by reasonable diligence, the information might have been obtained; the second is, that it was, in point of fact. within the reach of the party before the trial was concluded. I ought to add, that every person, who violates a patent, is bound. before he does so, to know that he puts himself to the peril of establishing a good defence, and he has no right to violate it, and then to seek indulgence from the court to find out some possible ground or some probable evidence to support him in his acts.

In respect to another objection, viz. that the court was bound to state what in point of law the invention claimed by the patentee was, I agree, that this is generally true, so far as the construction of the words of the patent, and specification is concerned. But then this doctrine is to be received with qualifications, and sub modo, as the very opinion of Mr. Baron Parke, cited by the counsel, in the case of Neilson v. Harford, Webster, Pat. Cas. 295, 370, abundantly shows; and the jury are to judge of the meaning of words of art, and technical phrases, in commerce and manufactures, and of the surrounding circumstances, which may materially affect, enlarge or control the meaning of the words of the patent and specification. But I do not proceed upon this ground. The court did explicitly give to the jury its construction of the patent in the present case, and that was. that it was for an improved machine. But then it was necessarily open to the jury to say, what part or parts of this improved machine were new; in other words, what parts and combinations of parts in the same were the invention of the patentee, and what were known before. If the defendant did not infringe the whole of the improved machine, that is, by making or using one entirely identical: yet if he did make and use a substantial part thereof, which was exclusively the invention of the patentee, and distinguishable from the other parts of the machine, that would be an infringement of the patent according to our law. This was

not a matter of mere law, but involved matter of fact, and left it open to the jury to say, what upon the whole evidence connected with the patent and specification was the extent of the plaintiff's invention. Did the plaintiff invent the aggregate or combination only incorporated in the machine? Or did he invent certain parts also of the machine distinguishable from the rest, which were unknown before? It was to this part of the case, which seems to have been misunderstood by counsel, that the language referred to in the charge was addressed, when the court said: "If you (the jury) should be of opinion, that the original machine is composed of parts, all of which were known before. and that Woodworth's invention was a mere aggregate or combination of those parts, to which the carriage was indispensable, you will find for the defendant. But if, on the contrary, you think, that the defendant uses parts of Woodworth's real invention, or if his machine is but an improvement on the original, and not substantially and essentially different from it, the verdict should be for the plaintiffs."

The next ground, which has been most elaborately argued, is, indeed, to a point, confessedly merely technical and aside from the real merits. It is, that the assignment under which the plaintiffs claim, does not convey to them a territorial or sectional right under the patent in the sense of the patent act of 1836, c. 357, and the subsequent acts. I say, that this is purely technical, and aside from the merits, and would involve a mere question of costs, since it was admitted at the trial, that, by agreement between the parties, it was arranged that the name of the patentee or other proper party might be substituted, if the court thought the objection valid. To allow this objection now to prevail, if upon the merits the case were otherwise unobjectionable, would be in effect, therefore, to turn the parties round to a new suit, upon a ground that is not entitled to any favor, and stands upon the very limits strictissimi juris. So far as the law goes, the party is entitled to it; but certainly not beyond that.

Let us now proceed to consider the language of the instrument or indenture of assignment of the 2d January, 1843. It is difficult to make the whole force of the argument understood, without citing at large some of the clauses, which I shall accordingly refer to as before the court. The indenture, after reciting, that for certain considerations, therein stated, the patentee "hath agreed to license and empower parties of the second part (the plaintiffs) to construct and use, and to license others to construct and use, fifty of the said patented machines, within the counties of Suffolk, and Norfolk, and in the towns of Charlestown. Cambridge. West Cambridge. Watertown, Medford. and Malden and Rockbottom village, in the county of Middlesex. in the state of Massachusetts; in such manner, nevertheless, that the license

and authority so granted shall stand and be as security unto the party of the first part (the patentee), and his assigns, for the payment of each and all of the said promissory notes" (the consideration money), proceeds to say: "First, the party of the first part (the patentee) does hereby license and empower the parties of the second part (the plaintiffs and their executors and administrators) to construct and use fifty of the said patented machines within the territory aforesaid; and also within the same territory to license and empower other person or persons to construct and use one or more of the said patented machines during the whole period for which the said letters patent have been granted; but the whole number of machines by the parties of the second part (the plaintiffs), and by all persons empowered by them, constructed and used during the said period in the said territory, shall not at any one time exceed the said number of fifty machines." Then follows a proviso, providing for a sale of the right granted to the plaintiffs, in case of a default in the payment of the notes given for the consideration-money. I do not know, that any thing very important can be gathered from it, to assist our inquiries upon the present occasion, unless it be, that it speaks in one place of the sale of "all the right, title and interest which are in any way granted unto" the plaintiffs; and, in another place, that, upon the sale, the patentee may, in the names of the plaintiffs or their assigns, "convey and assure the same to the purchaser, and thereupon all license, power and authority" of the plaintiffs and their assigns, &c., "shall cease." If the language of this proviso is to have any distinct effect, with reference to the point before the court, it is, that it is explanatory of the preceding clause, and shows that the words "right, title and interest granted," and "license, power and authority," were used by the parties as precise equivalents. Then comes the second clause, by which the party of the first part (the patentee), and the party of the third part (Wilson), covenant with the plaintiffs, that they will institute suits at law, and in equity, against any and all persons, who shall infringe upon the patent aforesaid, within the territory aforesaid, during the period of two years from the date of the indenture, at their own expense; and after deducting the expenses of the suits, &c., to pay over the damages recovered to the plaintiffs. The third clause may be passed over as not important. The fourth clause then provides, and the plaintiffs covenant with the patentee and Wilson, that they will at all times, during the said term of two years, suffer and permit the patentee and Wilson to use their names in all such suits as may be commenced as aforesaid, and that they will aid and assist them (the patentee and Wilson) to procure the necessary evidence to sustain such suits when com-

menced. The fifth clause contains a covenant by the patentee with the plaintiffs, "that he will not license and empower any person or persons to use any of the aforesaid machines within the territory before named during the said term of seven years for which the said letters patent have been extended. But nothing herein contained shall be so construed as to prevent the party of the first part (the patentee) from constructing or licensing the construction of the said machines to be used elsewhere than in the territory aforesaid."

Such are the most material parts of the indenture, which are necessary to be brought directly under review in the present discussion. The whole argument of the defendant's counsel turns upon this, that the instrument amounts, not to a grant of a sectional right of the patent in a particular territory, but as merely a license to construct and use fifty machines within the prescribed territory. There is no magic in particular words; but we must understand them, as they stand and are used in the particular instrument; and in searching for the true interpretation, we must look to all the provisions of the instrument, and give such effect to it, as its obvious objects and designs require, without nicely weighing the precise force of single words. Much stress has been laid upon the words "license and empower" in this instrument; as though they imported something different from "grant." There is no doubt, that the words may be used in contradistinction to "grant;" but it by no means follows, that they are or must naturally or necessarily be so construed. In a broad and general sense, in common parlance, we use the words indiscriminately. We say, that a license or power is granted to do so and so; and no one ever perceives any impropriety in the language. A mere license, properly so speaking, passeth no interest in the thing, but only makes an action lawful, which without it would have been unlawful. But if it passeth an interest therein, then it is no longer a mere license, but a grant. So the law is laid down in Thomas v. Sorrell, Vaughan. 351. See, also, Warren v. Arthur, 2 Mod. 317. In Brooke's Abridg., "License," pl. 19, it is laid down, that if a man license one to enter into his land and occupy it for a year, &c., it is a lease, and should be so pleaded, and not as a license. And for this he cites 5 Hen. VII. 1, which, upon examination, I find fully supports the proposition, if indeed it were possible to entertain a doubt upon the point. S. P., Hall v. Seabright, 2 Keb. 561; 1 Mod. 14; 1 Sid. 428. Now, in the present case, there can be no doubt, that the instrument did not convey a mere license, but a license coupled with an interest in the machines, and in the patent right itself, so far as concerned these machines. So that there is nothing in the language, which in any manner restricts the interpretation; and we are at full liberty to

construe the words "license and empower" to mean a grant, if that will effectuate the true intent and apparent objects of the parties. Now, what were the true intent and objects of the parties in the present instrument? They were, in my judgment, to give the exclusive right, for the purpose of profit, to construct and use the patented machines, and with them the exclusive right to the patent itself, as an appropriate incident, within the prescribed territorial limits. This is made clear by the covenant on the part of the patentee, that he will not license and empower any other person to use the same machines, within the same territory, during the whole period of the running of the patent right under the patent. Then comes the proviso, that nothing in the instrument shall be so construed as to prevent the patentee from constructing or licensing the construction of the said machine to be used elsewhere than in the prescribed territory. It is suggested, that this proviso shows, that it was the intent of the parties to allow the patentee, and any other persons licensed by him, to construct machines within that territory, to be used elsewhere, which is a right inconsistent with the supposition, that the patent right had passed to the plaintiffs. I confess, that upon a close examination of the language, I entertain great doubts, if this is to be deduced as a very clear inference from the language used. The word "elsewhere," in its actual connection, is susceptible of being applied, as well to the construction, as the use of the machine elsewhere, and thus to be deemed a mere cautionary provision, very proper in cases of this sort, to prevent misinterpretation. And if the other parts of the instrument would justly lead to the conclusion, that the patent right was intended to be exclusively granted to the plaintiffs within the prescribed territory, I should not scruple, ut res magis valeat, quam pereat, to adopt it.

But assuming the true interpretation of the words to be, as the defendant contends, it by no means leads to the conclusion for which it is urged. Even upon his construction, the patentee, or his licensees, could not use or sell for use any machines within the territory, if they could construct them there. Now, the right to use the machines is as much a part of the patent, as the right to construct them; and supposing the patent right to be, in contemplation of law, an entirety, then we should have a case, in which the intent of all the parties, upon the very face of the instrument, would be utterly defeated, and the instrument itself become a nullity, or neither party would have any right whatsoever against third persons under the patent, for any violation thereof. The patentee intended to convey to the plaintiffs and their assigns, the sole and exclusive right to use the machines constructed by them, within the territory, and to reserve to himself and his licensees at most only a concurrent right to construct machines, but not to use them within the territory, so that nothing was intended to be reserved to the patentee but a naked concurrent right to construct, and to the plaintiffs a similar right to construct, with the full and exclusive use of all the machines constructed by them within the territory. If by law such an intent cannot be carried into effect, because the patent is, as to all the operative rights granted therein, "the full and exclusive right and liberty of making, using, and vending to others to be used, the invention," entire and indivisible, then, as has been suggested, the instrument is a mere nullity. If, on the other hand, it is an operative instrument, then, as the exclusive use of the machines within the territory has passed to the plaintiffs, the patentee can maintain no suit for any violation thereof, therein, for he has no residuary right to such use; and the plaintiffs can maintain no suit for such violation, according to the argument of the defendant, because they are not assignees of the entirety of any territorial right. I confess, that if I were driven to make a choice under such difficulties—in order to escape from such consequences, going manifestly to defeat all the proper purposes of the patent acts—I should rather construe these acts distributively, and say that the patent right ought not to be deemed an entirety, but to be divisible, so as to permit a grant of the exclusive right to construct to one person, to use to another, and to vend to another.

But I am not driven to make any such choice. On the contrary, a construction of the instrument perfectly consistent with its terms and intent and objects, taking all the clauses together, may be adopted, which shall give full effect to every part thereof. Suppose the instrument had in terms declared, that the patentee granted the exclusive right of the patent within the territory to the plaintiffs, but the plaintiffs were still to permit and allow the patentee and his assigns to construct machines within that territory, to be used and sold elsewhere, there could be no difficulty, in law, in giving full effect to such a provision. The patent right would pass to the plaintiffs within the territory, and the patentee and his assigns would still be entitled, as licensees under the plaintiffs, to construct machines, without infringing the grant, within the territory. Now, this is precisely what, in my judgment, the parties intended in this case to do, and what, taking all the clauses together, they have actually done. In the first place, the grant, for so I call it, was not a mere personal naked license to the plaintiffs; but it was intended to be an assignable interest. The plaintiffs were to construct and use, and to license others to construct and use, machines within the territory. They might assign their whole right to all the machines, or to any one or more of them. Suppose a man should sell a horse to another, and the buyer were to agree, that the seller should have the privilege to use the horse once a week, as his occasions may require, would not the exclu-

sive property in the horse pass to the buyer? Suppose a person should buy of another a loom for weaving, and he should agree, that the seller might weave certain cloth in it, would not the sale convey the entire title to the loom to the buyer? Suppose a person should buy a corn-mill of another, and should agree at the same time, that the seller might grind his own corn therein, would not the entire title to the mill pass? I put these cases, because they stand upon a strong analogy, and show that there is nothing unreasonable or repugnant in giving such constructions to instruments of this nature.

In the next place, if there was any violation of the patent right within the territory, in whose name was the suit contemplated to be brought? Plainly, as the fourth clause, already referred to, shows, in the name of the plaintiffs, and yet at the expense of the patentee; and the plaintiffs were to receive all the damages recovered, after deducting the costs and expenses of the suits. Now, this very clause is decisive to show, that all the parties contemplated, that the patentee had parted with all his patent right within the territory, and that it was exclusively vested in the plaintiffs. If that was the intent—the true and sincere intent, what is there in the law which prevents this court from giving full effect to it? But it is said, that the parties acted under a mistake of the law on this subject. But how does that appear? It is assuming the very matter in controversy, and assuming it, when, upon the interpretation of the instrument itself, already suggested, there was no mistake of law at all. It is clear, that the parties intended no mistake of law, and we are not at liberty to defeat their intentions by assuming, that one did exist.

The very proviso already commented on, corroborates the views already taken by the court. If the parties did not intend, that the plaintiffs should have the exclusive right to the patent within the territory, but meant, merely, that the plaintiffs should possess a limited license therein, the proviso, so sedulously incorporated into the fifth clause, was utterly useless and unnecessary. But, if the plaintiffs were to have such an exclusive right, then the proviso may have a very just, and, in one view. a very important operation. Upon the construction contended for by the defendant. it secures a license to the patentee, to construct machines within the territory, although not to use them or vend them there. In the other aspect, it excludes any conclusion, that the patentee did not "elsewhere" retain his full and exclusive right and liberty to make, use, and vend any machines. whatsoever, under the patent.

But it is suggested, that the limitation of the right, granted to fifty machines. shows, that the patentee contemplated a license for that number only, and not an exclusive grant of the patent to construct and use machines within the territory. I profess not to feel the force of this, as an independent, or cogent objection.

It is a circumstance, in the case, fit to be weighed. But it is, by no means, one. that is, in itself, entitled to very grave consideration. The limitation of the number of machines, to be made or used under a patent, is not inconsistent with the grant of an exclusive right in the patent, within a particular territory. It is a matter of policy, or convenience, or profit, to be judged of by the parties, as to its effects upon the value of the patent right, out of that particular territory. Suppose a patentee should sell an undivided moiety of his patent to another person, and should agree with him, that neither of them should erect more than a given number of machines; so that the market should not be unduly glutted with them, either for use or sale; or suppose that the patentee should sell the exclusive right of his patent to A., in six of the United States, to B. in six other states, and to C. in six other states, retaining the remaining states to himself. and he and they should mutually agree not to make or use, or vend. more than a fixed number of the patented machines in any one state, what would there be in such an agreement inconsistent with the exclusive right of each within his prescribed circuit of states? I profess to be unable to perceive any legal objection to such an agreement, or to its legal operation, as an exclusive grant of the patent, within the prescribed states. There is, or at least may be, a wide difference between the right to a thing. and the unrestricted exercise of that right, under a grant. A man may purchase a house in fee, and yet he may limit himself, as to his mode of enjoyment thereof; as, for example, he may covenant not to carry on a particular trade there, or not to let it for a tavern, or not to let it in parts to more than four families at the same time. The house is still in his exclusive ownership, although he should thus qualify the general rights, ordinarily incident to that ownership. The limitation of the number of machines in this case. was. at least, as far as we can gather from the nature and apparent objects of the instrument, not designed to prevent an exclusive patent right within the territory, but to exclude an injurious competition to the patentee, elsewhere. If the plaintiffs were at liberty to construct and use as many machines, as they pleased, within the prescribed territory, the value of the patent right, to the patentee, in all the adjacent and neighboring territory. might be materially impaired, if not totally extinguished. The limitation, then, was designed. not to change the nature of the right. but to limit its exercise. It was not to reduce it from a grant to a mere license, but to limit the extent of the actual exercise of the right granted. It is not, properly speaking, an exception of a part out of the thing granted, ejusdem generis; but it is a restriction upon the mode and extent of using it. There are many other suggestions, which might be made upon the true character and interpretation of this instrument, and various other expositions have been relied on. at the argument, upon which I forbear to comment, because

they do not appear to me materially to alter, or control those, which have been already considered. I do not say, that the interpretation of this instrument is free from all doubt. But, that, which approves itself best to my judgment, is that, which has been already stated. The opposite conclusion could not, in my judgment, be arrived at, without encountering more difficulties—some of which strike me to be almost insuperable. On the whole, therefore, I hold, that the interpretation given to the instrument at the trial was the true one, and it has not been shown to be erroneous.

For the reasons already given on the other points, as well as on this point, the motion for a new trial must be overruled, and judgment pass upon the verdict for the plaintiffs. I have the less hesitation in coming to this conclusion, because the present trial is not absolutely final; and the merits of the case may be fully considered in the bill in equity, and carried for a final decision to the supreme court.

Upon the other motion for an injunction, founded on the bill in equity, it is not necessary to say much. The injunction is asked for, upon the ground of long possession, the renewal of the patent, and the legal effect of the trial at law. In respect to the possession, the case is certainly very strong. The original patentee (Woodworth) went to his grave in full possession of it, if not undisturbed and undisputed, as to his title to the invention patented, at least without any successful impeachment of it. The patent has been renewed, since his decease, by the board of commissioners, after full examination and deliberation, in favor of his administrator. I think, too, that it was clearly established at the recent trial, that Woodworth was the true and original inventor of the machine patented, and it was so found by the jury. Indeed, the only question, upon the merits, was, whether the defendant used the patent machine, or one substantially different from it. Upon that, as a question of fact, there was a considerable conflict of evidence. But the jury found a verdict upon that point, also, for the plaintiff, and, as it appears to me, according to the preponderance of the evidence. The defendant has established no title in himself, or in any other person, to use the patented invention; and he has failed in his defence, that he did not violate it. The doctrine laid down by Lord Eldon, in Hill v. Thompson. 3 Mer. 622, is. in my judgment, the true doctrine, and is indispensable to the repose of titles, and the security of patentees. It is this,—that where a patent has been granted, and an exclusive possession, of some duration, under it, the court will interpose its injunction, without putting the patentee previously to establish the validity of his patent by an action at law. But where the patent is but of yesterday (meaning. that it is recent), and upon an application being made for an injunction, it is endeavored to be shown, in opposition to it, that there is no good specification,—or otherwise, that the patent ought not to have been granted, the court will not, upon its own notions, respecting the matter in dispute, act upon the presumed validity or invalidity of the patent, without the right having been ascertained, by a previous trial at law; and will send the patentee to law, and oblige him to establish the validity of his patent, in a court of law, before it will grant him the benefit of an injunction. Correctly considered, there is nothing in Lord Cottenham's judgment, in Collard v. Allison, 4 Mylne & C. 487, which in any manner impugns or shakes this doctrine. In that case. a new trial at law had been granted, and therefore his lordship held the legal title of the parties, as still undecided. I have, myself, in former cases, adopted Lord Eldon's doctrine, and, especially, in the case of Ames's paper manufacturing patent, which was, at the time, most strenuously contested upon various grounds, and, especially, upon the ground, that the invention was not new. Yet the jury having, after a great conflict of evidence, established the validity of Ames's patent, an injunction was granted. I shall, therefore, direct an injunction to issue, and to remain, until the hearing of the cause, or the further order of the court.

[For other cases involving this patent, see note to Bickness v. Todd. Case No. 1,389.]