RUUD MFG. CO. v. PITTSBURG WATER HEATER CO.

(District Court, S. D. New York. November 8, 1912.)

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—WATER HEATER.

The Ruud patent, No. 903,007, for a water heater, consisting of an automatic instantaneous heater, in which the water flows through thin copper coils over the burners, and the flow of gas to the burners is controlled and regulated both by the flow of water through the water conduit and the temperature of the water flowing from the heater, acting through the medium of a thermostat, was not anticipated and discloses a patentable combination of utility. Claims 3, 5, and 8 also *held* infringed, and claim 10 not infringed.

[Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

In Equity. Suit by the Ruud Manufacturing Company against the Pittsburg Water Heater Company for infringement of the Ruud patent, No. 903,007, for a water heater. On final hearing. Decree for complainant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

S. T. Cameron and Reeve Lewis, both of Washington, D. C., and C. A. L. Massie and Ralph L. Scott, both of New York City, for complainant.

J. Edgar Bull, of New York City, and Paul Synnestvedt and James C. Bradley, both of Pittsburgh, Pa., for defendant.

MAYER, District Judge.    Prior to the invention of the patent in suit, the art of automatic instantaneous water heating had developed along two main lines: (a) The "straight water valve" heater; and (b) the "straight thermostatic" heater.[1]

The (a) heater had the advantage of economy, in that no gas was consumed except when water was being drawn.    The disadvantages were: (1) That the water-actuated element was liable to become stuck in its opened position, owing to the presence of salts in the water, sand, pebbles, and other small objects, so that the gas would continue to burn when no water was being drawn, and steam would be generated in the thin coils and burst them; (2) that there was no means of regulating the temperature of the heated water; (3) that the amount of gas consumed was not proportioned to the amount of water heated under the varying conditions of gas and water main pressure.

The (b) heater had the advantage of safety in avoiding the danger of overheating the water and bursting the coils.    When the temperature of the water was below the desired degree, the thermostat automatically opened the gas valve wider, thus increasing the amount of gas delivered to the burners, and when the temperature rose above the desired degree the thermostat automatically reduced the opening of the gas valve, this being accomplished by subjecting the thermostat to the influence of the heated water.    The disadvantages were: (1) Wastefulness, because the (b) heater consumed enough gas to keep the water at the desired temperature all the time, without regard to whether any hot water was being withdrawn from the system or not; (2) occasional danger in case the pilot light was accidentally extinguished while the thermostatic valve was closed, in which event the gas valve would be thrown wide open when the water cooled, and unconsumed gas would flow into the compartment; (3) nonproportion of amount of gas consumed to amount of water heated, as in the (a) heater.

Automatic water heaters are usually situated in the basement or cellar of a building and connected with the public water and gas main systems, and the hot water is withdrawn from the water pipes in the kitchen, bathroom, laundry, or other room, where the person using the water is far removed from the heater and unable to know the functioning of the device, beyond the fact that hot or cold water is being drawn.

Both the (a) and (b) heaters had been on the market for a considerable period prior to the date of the invention here under discussion.    It is clearly shown that the (a) heater was not a commercial success, while the success of the (b) heater was limited to natural gas

[1] Note.—For brevity I shall call these hereinafter the (a) and (b) heaters.

territory, because of the large cost of operation in artificial gas territory.

The problem to be solved, and here claimed to have been solved, was to produce an instantaneous, automatic water heater, which would (1) be safe; (2) be economical; (3) heat the water to a desired predetermined temperature, and (4) proportion gas consumed to amount of hot water drawn, even in localities where gas and water main pressures fluctuate.

This was an interesting problem, having to do with an important and useful art, which has much conduced to health and comfort.

Ruud was an experienced man, who had already made contributions to the art, and he was able, therefore, to approach the consideration of this problem in a practical way. He was not searching for a theory, but for an operative structure, and there can be no doubt that he produced an efficient and highly useful article in the "T. V." heater, as it is called.

From the outset, this T. V. heater became a commercial success, so much so that the Monarch Company, a competitor, adopted the Ruud invention at a time when the patent application was pending and when letters had not yet been issued.

Ruud filed his application in January, 1900, and obtained his patent in 1908. In 1907 an officer of the Ruud Company left it and was influential in organizing the defendant company, of which he became president, and in that organization he combined two existing concerns (the Monarch Water Heater Company and the Standard Heater Company), which had been losing money in manufacturing the (a) heater.

There are many charges of unfair and improper conduct made by complainant against the president of defendant. These I have disregarded as immaterial to the issues; but what we call human nature very often illuminates a situation, and it is manifest that the president of defendant, as well as defendant, well realized that Ruud had produced an article of utility and commercial value, which was theretofore unknown to the markets of this or any other country.

Was there inventive genius behind this production, or was it obvious to the man skilled in the art, and a mere aggregation of old elements, and not a combination attaining a new result?

The invention of the patent in suit consists of an automatic instantaneous water heater, in which the water flows through thin copper coils over the burners, as in the old heaters, and the flow of gas to the burners is controlled and regulated both by the flow of water through the water conduit and the temperature of the water flowing from the heater acting through the medium of a thermostat; the parts being so arranged that all of the gas which flows to the burners to effect the heating of the water is subjected to the control of the water-actuated element, and to the regulation of the thermostat or temperature-actuated element. By this means all of the objectionable features of both of the old heaters were eliminated, and all of the desirable features of those heaters retained, and in addition to this an entirely new result was secured in this art, viz.,

the proportioning of the amount of gas consumed to the amount of water heated under all the varying conditions of water and gas main pressures and temperatures. (Bartlett, C. R. p. 268.) This new result was of the highest importance in the art. If no hot water was withdrawn during a given period, no gas was consumed, except the negligible amount burned by the pilot light; and, if hot water was withdrawn, the amount of gas consumed was always in proportion to the amount of hot water so withdrawn. The object of the invention set forth in the patent in suit is stated in the patent itself to be:

"To provide effective and reliable means whereby waste of gas, during periods in which it is not desired to heat water, may be prevented, and liability to damage to the heating appliance or its connections, by the application of heat in the absence of a proper supply of water, or by the excessive application of heat when water is not drawn off from the heater, due to the sticking of the water valve mechanism, may be effectually obviated." (Page 1, line 21 et seq.)

To accomplish these objects, Ruud introduced into the gas service conduit a gas-supply valve and a gas-regulating valve, by which two valves the supply of gas to the main burners is controlled and regulated.

The main or water-actuated gas valve is always thrown wide open, and is of sufficient size to admit enough gas to heat the water to the desired temperature at the highest water main pressure and the lowest gas main pressure. With the high water main pressure a larger amount of water would flow through the heater, per unit of time, than with the low water main pressure, and if the supply of gas were constant the result would be that the water would be heated to a higher degree at a low water main pressure than at a high water main pressure.

When the water in the heater reaches the degree of temperature to which the thermostat is adjusted, the thermostat immediately begins to actuate the thermostatic valve to reduce the size of the opening controlled thereby, and hence to reduce the amount of gas which flows to the burner. Should the gas pressure be high, more gas is supplied than is needed to heat the water to the desired temperature, and the thermostat operates to cut down the amount of gas until just enough is supplied to heat the water flowing through the conduit to the temperature desired. Should the pressure in the gas main fall, the temperature of the water would fall, and this would act to open the thermostatic valve wider, so as still to permit enough gas to flow to the burners to heat the water to the desired temperature.

Thus the water is heated to the desired temperature, whether a large or small amount of water, within the capacity of the heater, is being drawn, and the supply of gas to the burners is regulated to suit the amount of water heated, and this entirely independent of what may be the water main or gas main pressure at the instant of time when water is being drawn; and, if no water is being drawn, the flow of gas to the burners is entirely cut off by the water-actuated or main gas valve.

It was old in the art to employ the movements of a part actuated by the flow of the water through the heater to control the flow of gas to the burners of the heater; and it was also old to employ the movements of a heat-actuated element to control the flow of gas to the burners. These old elements had been separately used in heaters to control the flow of fuel to the burners; but Ruud, for the first time (it is claimed), combined the two elements in a single heater.

I am satisfied, on the evidence, that this combination produced a result which was not an aggregation of old elements, each merely performing an old and well-known function, and not bringing about a new result. If I am right in concluding that the new result, insisted upon by complainant, was accomplished by the combination of these old elements, then it seems to me that the case is one of invention.

Of course, it is very easy, at this date, to see how it was done; but this is an active art, attractive financially, and constantly inviting improvement, and, if invention was not involved, it seems strange that no one had disclosed, prior to this time, any structure which represented what is embodied in the Ruud or T. V. heater.

It is claimed, however, that the prior art shows water valve heaters as defined in the claims in issue. With this view I cannot concur. The limits of an opinion preclude a detailed discussion of the various patents cited by defendant in support of its position on this branch of the case. Suffice it to say that I adopt, in substance, the arguments set forth in complainant's brief.

The defendant, however, further insists that the patents to Fontaine (114,429), Braithwaite (9,598 of 1888), Winterflood (587 of 1899), and Wilder (548,941) each constitute a substantial anticipation of all the claims in suit.

Fontaine Patent. Defendant's expert built a hot-water heating apparatus along the lines of the Fontaine patent, but introduced various changes and adjustments into the construction and method of operation of the device. The complainant insisted that this was not a fair apparatus test. But, even assuming this apparatus to have been in accord with the Fontaine patent, both the construction and the method of operation differ in many essential particulars from the construction of the invention in suit, and fail to disclose a structure which would accomplish the results attained by the Ruud invention. (C. R. pp. 278, 281, 284 et seq.)

Braithwaite Patent. The Braithwaite heat-actuated element had no effect upon the supply of gas to the burner independently of the flow of water, or independently of the water-actuated elements. The only effect of the heat-actuated element which the Braithwaite contemplated, and which could occur in the Braithwaite apparatus, was to change the degree of the difference in pressure by which the fuel valve is actuated when water is being drawn from the heater. If no water was being drawn from the heater, the thermostat would have no effect upon the supply of fuel, so that, if the fuel valve should become stuck in its open or partly open position, the heater would be overheated,

and either explode or the water [be] driven out, and the heating receptacle destroyed, notwithstanding the presence of the thermostat. The thermostat, therefore, would not overcome one of the serious defects of the type of heaters in which the supply of gas is automatically controlled by the flow of water, and the Braithwaite heater failed to meet this difficulty, and thus was not capable of accomplishing one of the chief results secured by the Ruud T. V. heater. There are other respects in which the Braithwaite was not an anticipation, as more fully discussed by Mr. Freeman, one of complainant's experts. (C. R. p. 355 et seq.)

Winterflood Patent. In this patent two valves in the fuel supply conduit are disclosed, one actuated by the flow of water to the heater, and the other a safety valve, not regulating the temperature of the water in the heater, as does the thermostatic valve in the Ruud heater. (C. R. pp. 292 et seq., 340, and 341.) Thus there is no thermostatic action in the Winterflood apparatus in actual use, nor is there any valve thermostatically controlled.

Wilder Patent. In hot-water heater constructions, the water is led to the heater through a conduit, and the gas through another conduit and outside of the heater there is always placed a stopcock in each conduit, so that the water may be cut off, and the fuel cut off, when desired. In a straight thermostatic heater, such as (b), a person would turn the stopcock in the water pipe, and the stopcock in the fuel supply pipe, and light the pilot light. Then the heater would operate continuously to maintain the water in the heater at the temperature at which the thermostat is set, and would consume sufficient gas to keep the water in heater at this temperature, even if no water were drawn out. If a careless operator should turn on the gas in such a straight thermostatic heater and light it, and then neglect to turn on the water, the heater would be soon overheated, and probably destroyed. In order to avoid such carelessness, Wilder connected the manually operated stopcock in the fuel supply pipe and the manually operated stopcock in the water supply pipe, so that the one could not be turned on without turning on the other. There is a good deal to be said for the Wilder structure, but there was no water flow actuated element in that structure, and hence nothing which may be said to be the equivalent of the water-actuated valve of the Ruud T. V. heater.

In his ingenious argument that certain of these patents accomplished by a short-arm what Ruud accomplished by a long arm, the learned counsel for defendant failed to make clear how what was obvious (as he urged) so successfully escaped the attention of these many inventors whose minds were moving along in the same general direction.

Being satisfied, therefore, that the patent in suit has disclosed invention, and that there was neither prior use nor anticipation, it remains to ascertain whether the defendant's structure infringes.

There are four claims which complainant alleges are infringed. From what has been outlined hereinabove, it is apparent that I hold

the view that claims 3, 5, and 8 are infringed by defendant. The remaining claim is as follows:

"10. In a water heater, the combination of a water receptacle consisting of a coil having an inlet and outlet, a burner for heating the same, a fuel supply conduit leading to said burner, means actuated by the water and controlling said fuel supply, independent means controlling said fuel supply, and a thermostat in the circuit of the coil and in operative relation with said independent means."

A study of the Ruud patent shows that the casing in which the thermostat is located constitutes, in effect, the lower coil of the heater inside the shelf; the water flowing downward through the upper coils of the heater and through the casing and out through the outlet to the faucet.

The thermostat thus lies "in the circuit of the coil," and is exposed to the direct action of the heat from the burners, thus getting a direct control of the gas valve by the hot water in the lower part of the heater. Ruud refers in the patent in suit to his previous patent, No. 610,218, which is particularly directed to this construction of placing the thermostat "in the circuit of the coil," so that it is exposed directly to the heat from the burners. In his prior patent Ruud says:

"The supply of heat is regulated by variation in the temperature of the water in the heating coil." (Page 1, line 13.) "The important feature of my improvement is the combination with a heating coil of a thermo-regulating device in or in circuit with the heating coil and forming part of the heating coil, * * * which is exposed to the heat." (Page 2, line 25.) "As·shown in the drawings, the thermostat is located relatively close to the burner, and this is a feature of my improvement, by which the efficiency of the regulation is greatly improved." (Page 2, line 76.)

The claims of the prior patent (1 and 2) also show that Ruud emphasizes the location of the thermostatic controlling means. Declarations or statements (where not self-serving) are a valuable aid in interpreting the meaning of writings. In the catalogue put out by complainant (Catalogue K, seventh edition) many references are made to the internal thermostat, as follows:

"The Ruud is the ONLY Automatic Water Heater possessing an Internal Thermostat, giving automatic 'Temperature Regulation,' insuring reliability, safety and economy. These exclusive features are covered by broad patents." (Title page.)

"THE RUUD AUTOMATIC VALVE AND INTERNAL THERMOSTAT
(Patented)

"Combining the simply constructed water valve and thermostat, placed in 'heat zone,' this arrangement gives an automatic control in practical use that is indeed remarkable." (Page 14.)

"It is the Internal Thermostat, however, that regulates the temperature. and controls the flow of gas to burners in accordance with the heat of the water." (Page 14.)

"Having the Thermostat directly in the gas flame, the possibility of steam generation and damage to the heater, enameled fixtures or house piping, is entirely eliminated." (Page 14.)

"This describes briefly our ORIGINAL Ruud Re-Heating System—so successful that it has been imitated by others; but without the Ruud Thermostat (located in 'heat zone' of heater) it is worse than useless, for should a value 'stick' (a common fault with so-called 'graduating' valves used on other heaters) steam is sure to be generated, with resultant damage to heater and plumbing." (Page 19.)

On page 10 of this catalogue is a photograph with references to various parts of the structure and the most conspicuous reference is "Internal Thermostat (in Heat Zone)." In the pamphlet or circular (Defendant's 4) it is stated:

"The excellency of the Ruud is to be found in its patented features: Its internal thermostat, combined with positively reliable automatic water valve mechanism, and separable flat top gas burners."

Also in advertisement (Defendant's 3):

"The Ruud is the exclusive user of an Internal Thermostat, working in combination with a patented water pressure valve."

It is clear that Ruud intended this to be a limited claim, and to define therein the kind of thermostat described and claimed in his prior patent, in which the thermostat is located in a portion of the coil in such manner that it is exposed to the direct action of the heat from the burner. This thermostatic arrangement, to which claim 10 is thus limited, is different from that employed by the defendant.

The defendant's construction is like that shown in the patent of Reinecke, 866,966, in which the thermostat is located in a casing which is outside the heater casing and outside the "circuit of the coil," there being no thermostatic means in the coils. In the Ruud construction it was desired to get the thermostat in position to be exposed to the direct action of the burners, while in the Reinecke patent a thermostatic regulation was secured, not by reason of the exposure of the thermostat casing to the heater, but in accordance with another principle, by the circulation of the hot water from the heater induced by the arrangement of the lowest coil. (3 in Reinecke patent.) By reason of this coil (called the reverse coil) water rises through it, passes through the thermostat casing and back to the top coil of the heater through a pipe, and thus accomplishes a continuous circulation past the thermostat even when the outlet is closed.

For the reasons outlined, I am of the opinion that the Ruud claim 10 is limited to the type in which the thermostat is located in a coil of the heater within the shell and exposed directly to the action of the heat from the burners, and, this being so, the defendant's structure, built in accordance with the Reinecke patent, and involving the use of the thermostat outside of the coil and outside of the heater, and depending upon a different circulating feature, does not constitute an infringement of claim 10.

The complainant may have a decree, with costs, as herein indicated.