PITTSBURGH WATER HEATER CO. v. BELER WATER HEATER CO.*

(Circuit Court of Appeals, Third Circuit. August 9, 1915.)

No. 1975.

1. PATENTS &wrap;328—VALIDITY AND INFRINGEMENT—INSTANTANEOUS WATER HEATER.

The Shook patent, No. 993,723, for an instantaneous water heater, in which a single gas valve, under the dual control of a water actuated valve and a thermostat, is substituted for the two valves of the prior art, *held* to disclose invention, and valid as against the claim of prior invention by another; also *held* infringed by the device of the Ellis patent, No. 1,053,370.

2. PATENTS &wrap;20—INFRINGEMENT—REVERSAL IN ORDER OF OPERATION.

A mere departure or reversal in order or form, while identity of principle, process, or result is retained, does not avoid infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 20–22; Dec. Dig. &wrap;20.]

3. PATENTS &wrap;16—PATENTABLE "INVENTION"—REDUCTION TO PRACTICE—"ANTICIPATION."

"Invention," from the statutory standpoint, requires not only an abstract conception, but a concrete adapting to practical use, and to constitute an "anticipation" or prior invention there must have been a reduction of the inventive idea to practice, either by its embodiment in a machine or the filing of an application for a patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 14, 15; Dec. Dig. &wrap;16.

For other definitions, see Words and Phrases, First and Second Series, Invention; Anticipation.]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the Pittsburgh Water Heater Company against the Beler Water Heater Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 222 Fed. 950.

S. T. Cameron, of Washington, D. C., and James C. Bradley, of Pittsburgh, Pa. (Synnestvedt & Bradley, of Philadelphia, Pa., of counsel), for appellant.

John H. Roney, of Pittsburgh, Pa., for appellee.

Before BUFFINGTON and McPHERSON, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns instantaneous water heaters. In them the water flows through a pyramided coil of thin copper pipe. When one wants hot water he opens the hot water spigot, and the flow of water automatically opens a gas valve of the heater and floods the coil with gas. This is ignited from a constantly kept burning pilot light. It was also customary to have in such heater à second gas valve, which was independent and was controlled by a thermostat.

The prior art is aptly described in Ruud v. Pittsburg Co. (D. C.) 200 Fed. 426, a case in the Second Circuit, where the court said:

"The invention of the patent in suit consists of an automatic instantaneous water heater, in which the water flows through thin copper coils over the burners, as in the old heaters, and the flow of gas to the burners is controlled and regulated both by the flow of water through the * * * conduit and the temperature of the water flowing from the heater acting through the medium of a thermostat; the parts being so arranged that all of the gas which flows to the burners to effect the heating of the water is subjected to the control of the water-actuated element, and to the regulation of the thermostat or temperature-actuated element. By this means all of the objectionable features of both of the old heaters were eliminated, and all of the desirable features of those heaters retained, and in addition to this an entirely new result was secured in this art, viz. the proportioning of the amount of gas consumed to the amount of water heated under all the varying conditions of gas and water main pressures and temperatures (Bartlett, C. R. p. 268). This new result was of the highest importance in the art. If no hot water was withdrawn during a given period, no gas was consumed, except the negligible amount burned by the pilot light; and, if hot water was withdrawn, the amount of gas consumed was always in proportion to the amount of hot water so withdrawn."

[1] This construction, Shook, the present patentee, sought to improve by using but one gas valve, and subjecting it to both the water-actuated and the heat-actuated control. In his patent, No. 993,723, applied for January 4, 1909, and granted May 30, 1911, to him for an instantaneous water heater, he said:

"I have found that one of these gas valves may be dispensed with, and that the controlling means therefor may be so arranged that all the advantages incident to the two-valve construction are retained, and other advantages not present in the two-valve construction secured, in addition to the general simplification and cheapening of the apparatus due to the use of one valve instead of two."

To appreciate the significance and value of Shook's conception, if it could be successfully carried out, we should note the necessity of the independence of the two gas valves. In the two-valve construction, one of the gas valves was subjected to the control of the flow of water through the heater; the other was subjected to the control of the thermostat, which was under the influence of the temperature of the water flowing from the heater, and such two controls were independent of each other. This independence is essential from the standpoint of safety; for by making the two controls independent safety is secured through thermostat control, even if the water piston stick. Shook's device disclosed an independent and dual gas control of a single valve, which he accomplished by subjecting such single valve to the dual control of (1) a water valve actuated by variations of water pressure, and (2) a thermostat governed by the heat of the water in the heater; the parts being so arranged that the thermostat or heat element could close the gas valve, even when the water element was in a position to open such valve. This he did by subjecting the gas valve to the action of two springs, one of which was under thermostat, the other under water, control.

In prosecuting his patent Shook's concept of a compound dual valve control was thrown into interference with two other applicants—Ruud, the subsequent grantee of patent No. 1,028,284, applied for July 8, 1909, and granted June 4, 1912, and Humphreys, the subse-

quent grantee of patent No. 928,310, applied for December 26, 1908, and granted July 20, 1909. In these proceedings Shook prevailed and was awarded priority. As these other inventors were granted specific claims, and as Shook was granted the broader and more generic claims involved in the interference, it would seem that, in the view of the Patent Office, the latter's disclosure was the generic one. It will also appear that the device has proved of large commercial value. In that regard the proof is:

"Q. How are the demands incident to varying pressures in gas and water mains met in the water heater art at the present time? A. By automatic instantaneous water heaters containing the dual control of fuel by independent means; that is, the flow of gas to the burners is independently controlled by a water-actuated element and a thermostatical-actuated element. Q. How important is this, or how has its introduction into the art affected the sale of heaters? A. It is of the greatest importance. It is absolutely essential that these heaters, to be commercially successful, must embody the safety and economy incident to this dual control. And the introduction of this dual control resulted in an enormously increased sale of these heaters."

Taking, therefore, claim 20, the subject-matter of which was involved in the interference, we find it is for:

"In a water heater, the combination of a conduit for water under pressure a burner for heating the water in said conduit, a normally seated valve controlling the flow of fuel to said burner, a compound power mechanism adapted to hold said valve closed, a device operated by the flow of water through said conduit for controlling one part of said power mechanism, and a device operated by variations of temperature in said water for controlling the other part of said mechanism."

We next inquire whether it is infringed by defendant's device. The latter is manufactured under patent No. 1,053,370, applied for April 25, 1912, and granted February 18, 1913, to Ellis. The specification of Ellis concedes his invention has for one of its objects:

"The provision of a single gas-controlling valve and mechanism therefor, to take the place of a plurality of gas valves as usually employed."

This, as we have seen, in language heretofore quoted, was also the object of Shook in his earlier disclosure. And that the machines made under these respective patents secure the same practical results is the proof:

"Q. Are you familiar with the dual-valve control known as the Pittsburgh single-valve heater, on the market to-day? A. I am. Q. Are you familiar with the heater known as the Beler hot water heater? A. I am. Q. Please state whether or not either or both of these heaters possess the control that you have just (above) described as essential to commercial success. A. Both of these heaters have this control. Q. Are there any advantages secured, speaking from the standpoint of a practical commercial man, that are secured by the Pittsburgh construction that are not secured by the Beler construction? A. There are none."

Seeing, then, the purpose of the two patentees is directed toward the same general object, the question of infringement turns on the inquiry whether the means the defendant employs to effect such object are covered by Shook's claims. That the defendant's device embodies the same three functional elements found in the complainant's device is frankly conceded by defendant's expert, whose testimony is:

"Q. Now I understand you to say, in describing defendant's construction, that you found there a gas valve which was under the control of the water valve or piston, and also under thermostatic control? A. Yes, sir."

The same witness, testifying of the devices of plaintiff and defendant, and also of a third (the Walker referred to below), says:

"Taking the three structures together, they are all alike, in that they employ a single gas valve and a water valve and a thermostat; the gas valve being under the control both of the water valve and of the thermostat. But they differ specifically in details."

[2] These detail differences appear to be that, while in Shook's device the gas valve is opened by the water valve and closed by the thermostat, the defendant's opens the gas valve by the thermostat, and closes by the water, valve. This to our mind is a mere alternative, mechanical choice of details, which in no way affects or modifies the principle of dual control. In both devices, the compound action and joint co-operation of water motor and thermostat to effect dual control of the single valve is utilized. It is in that dual, co-operating control of water motor and thermostat, and not in the mere order in which they are used, that the elements of infringement lie. The essence of the device does not center in whether the hand of the thermostat or that of the water motor be first used to open the gas valve, or be first used to close it, but in the joining of those two hands—water motor and thermostat—to unitedly control the gate when control· is vital. That a mere departure or reversal in order and form, while identity of principle, process, or result are retained, will not serve to avoid infringement, is a fundamental principle of patent law that needs no supporting citation. And of even lesser importance is the weighting of a valve whereby the defendant's device obviates the use of one of Shook's springs. Gravity acting through a heavier body and a spring acting through a lighter one are too obvious mechanical equivalents to make the substitution of one an inventive advance over the use of the other. It seems clear to us, therefore, that the defendant must be adjudged an infringer unless, as it contends, one Walker, and not Shook, devised and first reduced to practice the Shook device.

[3] Invention, from the statutory standpoint, requires, not merely an abstract conception, but a concrete adapting to practical use. Reference to opinions of the master minds in judicial patent work makes this clear. In Washburn v. Gould, 3 Story, 122, 123, Fed. Cas. No. 17,214, Mr. Justice Story said:

"The law is that whoever first perfects a machine is entitled to the patent, and is the real inventor, although others may  *  *  *  have had the idea, and made some experiments looking towards putting it in practice.  *  *  * He is the inventor, and is entitled to the patent, who first brought the machine to perfection, and made it capable of useful operation."

In Winans v. New York & H. R. Co., Fed. Cas. No. 17,864, Mr. Justice Nelson said:

"It is not the person who has only produced the idea that is entitled to protection as an inventor, but the person who has embodied the idea into a practical machine and reduced it to practical use. He who has first done that is the inventor who is entitled to protection."

And Mr. Justice Bradley, in Clark v. Willimantic, 140 U. S. 489, 11 Sup. Ct. 849, 35 L. Ed. 521, summarized the whole subject in apt words:

"A conception of the mind is not an invention until represented in some physical form, and unsuccessful experiments or projects, abandoned by the inventor, are equally destitute of that character."

Where an invention is described in a specification, and a patent for such invention is applied for, the filing of such application is equivalent to a reduction to practice. In reason this should be so, for since the statute requires, not only that such applicant disclose his invention, but also "the best mode in which he has contemplated applying that principle" (R. S. § 4888 [Comp. St. 1913, § 9432]), it follows that, if the applicant receives a patent, its issue implies a reduction to practice when the application was filed. Of necessity, therefore, the issue of Shook's patent raised a presumption of his reduction to practice of his device on January 4, 1909. But Shook carries both his conception and his reduction to practice to an earlier date. In March, 1907, Shook showed a sketch of his device to Frampton, the president of the Pittsburgh Water Heater Company, and explained its workings. Frampton says he thoroughly understood the invention from Shook's description and it looked promising. He says that, in view of the fact that a large number of other details of heater construction had also to be developed in a new heater the company proposed putting on the market, in order to permit a trial of Shook's device—

"* * * he told Mr. Shook that the testing and developing of his apparatus would have to be deferred until the rest of the heater apparatus was fully constructed and worked out in detail, and that he would bear the construction in mind, and have it built and carried out in a practical way as soon as possible; that they did not get around to this work in the shops for several months, but in the meantime he had a number of conversations with Mr. Shook, and discussed with him the desirability of making certain changes, among which was the placing of the spring inside of the water valve, instead of on the outside of such valve, which idea was that of the deponent instead of Mr. Shook," etc.

Frampton testified also that the work on the company's new heater was carried on steadily, and by November it was so far advanced that Shook's device could be applied to it; that it was so tested on the 1st and 4th of November, 1907, applied to the heater, and proved successful. The heater itself, with Shook's device, was then moved to the company's office, and was subsequently produced in evidence. Frampton says the operation of the device of the photograph as he saw it in November, 1907, was as follows:

"The apparatus was not connected up to a water heater in the usual way, but the pipe 5 was simply connected with the hot water outlet faucet of another heater. The head of the water valve I was removed, and the piston therein blocked in forward position. Hot water of gradually increasing temperature was then passed through the pipe 5 and casing of the thermostat, and, when the temperature of such water rose above a certain point, the spring 8 acting with the spring behind the gas valve, moved the arm 6 to the left, compressing the spring 7 and closing the gas valve. This experiment was repeated many times, and showed conclusively that, in case the water valve piston stuck open, the gas valve would be closed by the spring 8 and

the spring behind the gas disc, without the necessity of moving the piston of the water valve."

Reinecke, also employed then and now by the Pittsburgh Water Heater Company, says Shook showed him a sketch of his device and so explained its workings that as a practical water man—

" * * * he understood the action perfectly, and that the primary purpose of the device as Mr. Shook explained it to him was to do away with the necessity of two gas valves, and at the same time retain the dual control of the single gas valve from the water valve and the thermostat, and that he proposed to accomplish this by the use of the springs 2 and 3, the strength of the springs 3 and 8 being such that they would together be stronger than the spring 2, so that, when the temperature of the water rose above a predetermined point, the thermostat arm 4 would move to the left, compressing the spring 2 and closing the gas valve, even though the water valve 5 should be stuck in a forward position."

This witness fixes April as the time Shook showed him the device. Another witness, Charles O. Scholz, was superintendent of the Pittsburgh Heater Company. He says Shook came to work for that company in April, 1907. He corroborates Frampton in the fact that Shook's device could not be applied to the heater the company was then making; that the development of the company's new heater was pushed with the greatest diligence through the summer and fall of 1907; and that he was present when the test of the Shook device was made in November. He identified the machine, says his brother did the construction work, and that it worked successfully. The brother, J. A. Scholz, testified that he did the work as above, and that the tests were made on November 1st and 4th. His dates are corroborated by the time slips, which show he spent six hours on "experimental work on Shook valve" on November 1st, and nearly seven on November 4th. While Shook himself was not present at these tests, the evidence shows that they were made pursuant to pre-arrangement with him. In that regard the testimony of Frampton is:

"Q. What was said and done about the development of this invention when Mr. Shook disclosed it to you? A. I made a definite arrangement with Mr. Shook at that time that the construction was to be built, tested, and developed, as acquired by our factory. * * * Q. Please state your best recollection as to what was said and done at the time Mr. Shook disclosed this invention to you, and looking toward the development of the invention. A. I can't recall the exact words used, but I know certainly that an arrangement was entered into for the development of the apparatus, and the fact that we were to have the use and benefit of the latter."

The testimony of Shook is that, contemplating employment with the Pittsburgh Water Heater Company, he had a talk with Frampton, its president, the latter part of March, 1907; that at this time that company had just taken over the plant of the Monarch Company, and was engaged in the development of a new heater to supplant the Monarch; that Frampton explained to him their proposed new construction and—

" * * * called his attention particularly to the new gas valve which it was proposed to use, such gas valve involving the use of two seats and telescoping stems for the two discs employed; that at this time it occurred to him that it might be possible to use a gas valve having only a single disc,

inasmuch as such a gas valve would be cheaper to construct and less difficult to machine; that after this interview with Mr. Frampton, in March, 1907, he devised a scheme for securing the double control of the single gas valve by the use of a spring between the stems of the gas and water valves and by the use of an additional stronger spring for operating the thermostat; and that he made sketches of this arrangement."

He further testified he first disclosed the invention to Frampton at the office of the company, about the 1st of April, and—

" * * * suggested that it should be substituted for the double valve construction if it worked out satisfactorily from a practical standpoint; that Mr. Frampton seemed to understand the construction thoroughly and promised to try out an apparatus as soon as the new Pittsburgh construction was sufficiently developed in other respects to permit it, and later did turn the matter over to the experimental department for tests."

Shook says he also explained the invention to Reinecke about the middle of April. He says he made sketches from which he explained the same to Frampton and Reinecke. These sketches cannot be found,

"SHOOK'S SKETCH."

the accompanying one being made by Shook from memory. The statement that they were made is corroborated by the fact that Frampton was able afterwards to install and test the invention without Shook's further help. As to such test being made for him and in pursuance of his request, Shook's testimony is:

" * * * That although he did not work in the testing department, and did not work out the details of the construction as shown in his application drawings, he did disclose very fully and clearly to Mr. Frampton and Reinecke the principle of construction of the apparatus illustrated in his sketch, marked 'Shook's Sketch.' That after his first disclosure he had conversations from time to time with Mr. Frampton as to the development of his construction. That it was his wish and intention, when he disclosed the construction to Mr. Frampton, that the company should develop and use it, instead of their double valve construction. That the work done in developing the apparatus was with his consent, and that since the apparatus has been developed a large number of heaters involving his invention, and made along the lines of the apparatus as shown in Fig. 3 of his application, have been assembled under his supervision in the assembling department and are being placed upon the market."

The fact that Shook subsequently applied for a patent in behalf of the Pittsburgh Water Heater Company is in accord with the testimony that that company bore a relation of interest to the invention from the time of its conception.

Taking the testimony as a whole, we are of opinion it carries back Shook's full conception to March, 1907, and shows his reduction to practice in November following was reasonably prompt, and that under the circumstances the test inured to his benefit and carried the invention back to the latter part of March, 1907.

This brings us to the question: Do the proofs show an earlier conception by Walker, and an earlier reduction to practice by him? Walker places his conception as in December, 1906, and produces a sketch which bears that date. We are not impressed by this paper. The part of the paper in which the date is marked is erased, and does not embody the invention. There is no satisfactory proof to show when the other sketch, which is alleged to embody the invention, was placed on the paper. But, assuming for present purposes such conception was made at the time, it is, as we have seen, necessary for Walker to show also that his device was reduced to practice at an earlier date than Shook's reduction. This it is contended is shown by an alleged reduction by one Kiel, and in what was equivalent to reduction in the application by Walker for a patent.

Turning first to the Kiel reduction to practice, the testimony of Walker is:

"Q. When did you conceive of the invention described and shown in that patent, and particularly that shown in Fig. 2 thereof? A. In the year 1906; some time between August and December of that year; I believe it was about October of that year. Q. What did you do after that date towards perfecting and expediting that invention? A. I had the valves from an old Monarch heater removed, and made some sketches, with the idea of remodeling this heater to agree with my invention. I made several sketches, one of them along in December, 1906; and I made still further sketches in March, 1907, and took the matter up with the patent attorney in March, 1907; and this application was filed in July, 1907. Q. After the time you state you conceived of this invention in 1906, did you ever disclose the invention to anybody, and, if so, to whom, and when, and where? A. Yes; I disclosed the invention to Henry J. Kiel, of Wheeling, W. Va., and also to his brother, Irvin R. Kiel, of Wheeling. That was in 1906, and in the spring of 1907 I also disclosed it to a number of parties. * * * Q. What, if anything, did you do towards making or manufacturing the structure illustrated in your patent? A. As I have said in answer to a previous question, the Kiel brothers had an old Monarch heater of the old style, with a water valve only, no thermal valves, which we undertook to alter to agree with my invention; took the old valves off of this heater and made new ones for it. As I was in the government service, and had lots of other things to do, I am not certain just how far this work progressed. I never actually saw this heater in operation, but I saw the valves for it, and made sketches for the proposed valves for this heater. Q. When did you do this work, or when did you have it done? A. This was in the fall of 1906. Q. And it was prior to the filing of your application for your patent? A. Yes, sir. Q. Was there anything other than this done towards marketing or placing this invention of yours on the market? A. We formed the Kiel Manufacturing & Supply Company for the purpose of placing this on the market; but as a matter of fact, before we actually placed it on the market, this company had concluded to go into another line of business, and we didn't place this heater on the market. * * * Q. Did you ever see this in operation? A. Which? Q. The one first in the Kiel shop? A. No; I didn't see it in actual operation. Q. Will you give us, as nearly as you can, the exact date of that construction? A. It was in the fall of 1906, probably in the month of September or October. Q. Did you ever build another one involving the construction of Fig. 2 before this one was built? A. No. Q. I understand that the one you built never went into

actual use, outside of experiments, to ascertain whether it would work? A. Not in that exact form. It went into use. Q. With that valve mechanism on it? A. No. Q. You took that valve mechanism off? A. Yes. Q. And what did you put in its place? A. We put the original valves back on it, because we didn't care to disclose the patent at that time. Q. Then, up to the time of the making of this heater here in court (Exhibit ——, made as an exhibit in the case), that was the only heater that you ever built that even purported to embody the construction of Fig. 2? A. As far as I know. Q. Were you present when this heater in the Kiel shop, the construction of Fig. 2, was tried out? A. I was not present. I was on government work down the river."

The testimony of Henry J. Kiel shows that he, his brother, and Walker formed a company to market Walker's heater, that they applied for a patent, that the tests were made after the patent was applied for (July 22, 1907), and the projected company was eventually abandoned. His testimony as to the tests is:

"Q. What, if anything, was done after this disclosure to you by Mr. Walker towards perfecting and developing this invention? A. Then we bought a heater, or traded in one, or got one some way—we were in the business—and took off part of the valves, and had some drawings made, and some patterns made, and some valves made, and they were installed on this old Monarch heater, I think it was. Of course, it was very crude, and didn't give absolute service; there's no question about that. But then the features of his patent were there; that's the point. And while I didn't do all this work myself, I had some mechanics there, and, of course, we had made application for a patent and put a lot of work on it. * * * Q. When did these experiments or tests that you say took place take place? A. They took place after we made application for the patent. Q. After you made application for the patent? A. Oh, yes. Q. And what result was secured by those tests? A. Well, I can't just tell you. We had the heater connected up. Our place at that time was on the corner of Fifteenth and McCulloch streets, and we had the heater in the basement of that place, connected up with water and gas. And Mr. Gallagher was one of my plumbers that did a good deal of work on that heater, and there were some things about it that were not right. You know that was only made in a crude way, made by a file, you might say, and, of course, by a very poor mechanic, to my notion, and it worked, but it didn't work properly, and control the water properly. Of course, it wasn't worked out to a fine test; we were only testing it to find out whether it would work or not. Q. And did it satisfy you that it would work? A. Yes, sir. And then we got mixed up with a strike and a lot of other difficulties, and we just dropped it and paid no more attention to it. Of course, we figured that it was all right; but we never went any further with it. We were satisfied that the heater would work. That was our point. Q. The heater, crude though it was, did determine that it would furnish cold and hot water? A. Cold and hot water."

The testimony of William Kiel is:

"Q. Did you ever make a valve in conformity with Mr. Walker's idea? A. I worked on it, but didn't perfect it. Q. When did you work on it? A. At the same time, or shortly afterwards; about a month. I can fix that definitely by the fact that I was back in Omaha on October 2, 1906; and this was about a month prior to that date, not over that. Q. You worked on a valve in September of 1906? A. Yes, sir. Q. And what did you do on it? A. Well, I made a piston and a cylinder. I couldn't state definitely what all. I am sure there were some other things. I bought a spark coil also. Q. Was this valve applied to a water heater, within your knowledge? A. Yes, sir. Q. What kind of a water heater was it put on? A. I don't know. I didn't take notice to the name. Q. Did you put it on, or assist in putting it on? A. I did. Q. What was that valve? Was it a gas valve, or water valve, or what? A. My recollections are that we had a hose connected to it; it was water, I think

it was: I am sure. Q. Did you operate a heater with that valve on it? A. There was no fire in it, I know. Q. Can you give us any idea of the construction of the valve? A. Well, a machinist works by plans, and it doesn't matter to him just what the nature of the valve is; so long as he has definite measurements to make a piece by, he can make it; he might not know what a valve was really intended for. I don't mean to convey the opinion that I didn't know what that valve was intended for, for I did. Q. Under whose supervision was this valve being constructed? A. My brother Henry's. Q. Then I understand you to say that you got most of your information concerning the Walker heater through your brother Henry? A. I did. Q. And he was directing you how to make this valve and how to apply it? A. Yes, sir. Q. And was that in September, 1907? A. Yes; I can fix that by letters that I have that will show that I was here at the time."

This evidence, both in dates and in subject-matter falls short of showing a practical reduction to practice of Walker's device. Such tests as were made resulted in nothing, the proposed company was abandoned, Walker made no claims for any dual-controlled valve in his patent, so that his patent cannot be regarded as a reduction to practice, and, whatever the device was the Kiels made, it went, so far as Walker's testimony above shows, to the junk pile.

We turn next to the alleged constructive reduction to practice which it is contended arises by virtue of the issue to Walker of patent No. 886,100, applied for July 22, 1907, and granted April 28, 1908. That patent concerned a construction in which an electric spark igniter is used, and of every claim of the patent such igniter is in some form an element. That no dual-valve control device was sought to be patented by Walker is shown by the absence of such claims in this patent, by the testimony of Walker himself, viz.:

"Q. As a matter of fact, did you embody this valve mechanism in another application for a patent? A. No; I never applied for the other patent, although I intended to do so"

—and by his statements of his letter of June 19, 1907, to his patent counsel, where he says:

"The new temperature control of the water will be dropped for the present, and possibly patented later, if thought worth the cost."

That Walker had conceived of a dual control of the gas valve as early as July 22, 1907, is indicated by Fig. 2 of his patent application. But, as we have said, he did not claim it, and made no assertion or oath that he was the inventor thereof. Moreover, as we read his claims, none of them are based on Fig. 2, nor does the device therein shown disclose means of operating the igniter by any appliance actuated by the difference of pressure between the cold-water inlet and the hot-water outlet, which in some form is embodied in all the claims. No statute, decision, or principle of the patent law is cited to us which in our view warrants our regarding the mere presence of a drawing in a patent application, lacking the essentials noted, as equivalent to a reduction to practice of the device therein shown.

In the absence, therefore, of satisfactory proof that Walker ever reduced his conception to practice, it follows that the validity of Shook's patent must be sustained. The decree below will therefore

be reversed, and the case remanded, with directions to reinstate the bill and enter a decree adjudging claims 4, 5, 20, 21, and 22 valid and infringed, and directing an accounting.